**ROYAL INDUSTRIES, a corporation,**
**Appellant,**

v.

**ST. REGIS PAPER COMPANY, a**
**corporation, Appellee.**

Nos. 22456, 22717.

United States Court of Appeals
Ninth Circuit.

Dec. 22, 1969.

Robert M. Newall (argued), of Newall & Chester, Los Angeles, Cal., Christie, Parker & Hale, Pasadena, Cal., for appellant.

Bennett W. Priest (argued), of O'Melveny & Myers, Los Angeles, Cal., Ward, Haselton, McElhannon, Brooks & Fitzpatrick, Stuart A. White, Nicholas L. Coch, New York City, for appellee.

Before ELY, CARTER, and HUF-STEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Royal Industries ("Royal") brought this action against St. Regis Paper Company ("St. Regis") for patent infringement and unfair competition. Federal jurisdiction was based on 28 U.S.C. § 1338. Royal appeals from the orders of the District Court denying Royal's motion for a preliminary injunction (28 U. S.C. § 1292(a) (1)) and granting St. Regis' motion for summary judgment (28 U.S.C. § 1291).

St. Regis was licensed to practice the patent in suit and to use the manufacturing know-how to produce the patented product, plastic tie strips. Royal cannot successfully maintain its patent infringement-unfair competition action unless St. Regis' license was effectively terminated.

Royal contends that it terminated St. Regis' license for breach of an oral condition to the written license that required St. Regis to adhere to sale prices set by Royal. St. Regis replies that: (1) the California parol evidence rule forecloses proof that there was any oral price fixing agreement; (2) even if the oral condition could be proved, Royal, as one of two licensors, could not unilaterally terminate the license and Royal's colicensor joined in neither the notice of termination nor this action; and (3) if there were any such oral condition, it is unenforceable because it violates the antitrust laws.

The following facts are uncontroverted: Royal obtained the patent in suit by assignment from the inventor-patentee, Gerald C. Bower, in April, 1963. Shortly after it acquired the patent, it purchased 80 percent of the stock of Plas-Ties Corporation ("Plas-Ties"). Bower retained the other 20 percent of the stock. Plas-Ties was manufacturing and selling the patented article, and at all times material hereto, it has continued to do so. At the time Royal acquired the patent, negotiations were underway between Bower and Plas-Ties on one side and Pollock Paper Company Division of St. Regis on the other looking toward the licensing of St. Regis to practice the patent and to use manufacturing know-how developed by Plas-Ties to produce the product. After Royal acquired the patent and its interest in Plas-Ties, Royal entered the negotiations. The negotiations proceeded by way of correspondence and conferences among Royal's president, Johnson, Plas-Ties' president, Bower, and their patent counsel, and St. Regis' representatives, Jacobs and Lacy, and their patent lawyer. On May 2, 1963, at a meeting in Pasadena, the written license agreement was signed by Johnson for Royal, by Bower for Plas-Ties, and by Lacy for St. Regis. Lacy was vice president of the Pollock Paper Division. The signature of the president of St. Regis was not added un-

til the license agreement was sent to St. Regis' corporate offices in New York.

The licensing contract contains the usual provisions of a patent and know-how license. Then it pegs the amount of royalties payable to a percentage of the net dollar sales by St. Regis. It also contains this price reduction formula: "If Royal reduces its selling prices below those set forth in the attached Exhibit A, said 10% royalty shall be reduced one percentage point for each 5% reduction in the selling prices, provided however that the royalty shall not be reduced below 5%." Exhibit "A" is a list of Plas-Ties' sales prices. The written license contains several termination clauses, none of which bears any conspicuous relationship to a failure to maintain prices fixed by the licensors.

St. Regis' prices for plastic tie strips were the same as those charged by Plas-Ties until February 1966, at which time St. Regis reduced its prices. Plas-Ties followed suit the next month. In June 1966, St. Regis made another price reduction. Royal complained, and a conference between Royal and St. Regis followed. Thereafter St. Regis raised its prices, but not to the same price level as Plas-Ties. In May 1967, St. Regis again reduced prices. Royal's response was a letter dated June 8, 1967, claiming breach of contract and stating that the license would be terminated in 10 days unless St. Regis met Royal's price in the interim. St. Regis did not raise its prices. It refused to recognize termination and has continued to manufacture and sell the product.

In 1965, Royal acquired the remainder of Plas-Ties stock, and Plas-Ties since then has been wholly owned by Royal.

The existence of the claimed oral agreement is in dispute. Royal's version, according to Johnson's testimony, is this: Johnson had insisted throughout the negotiations that the contract must contain a provision permitting Royal to fix the prices at which St. Regis could sell the patented product. Without protection on pricing, he told St. Regis' negotiators, "I might just as well put a gun to my head." St. Regis representatives "objected strenuously on [sic] including anything in the agreement regarding price fixing because they said that we would probably have to go to jail as it was illegal, and that they would not put anything like that into the agreement." Johnson said that he did not think the agreement was illegal. St. Regis representatives remained adamant, and Johnson then said "Well, if that is the case we simply can't reach an agreement." At this juncture, the St. Regis people said to Johnson, "not once but many times," that " 'While we can't put that in the agreement, you have our positive assurance at all times that we will respect your prices. There may come a time when we may want you to drop prices, and in such event we will come to you and ask you, but if you don't think you can, and it is not the right thing to do, then we will stay with your price.' " After he received assurance that "we have a complete, positive, thorough understanding expressed by all three of them that they will at all times respect Royal's pricing," he agreed to sign the agreement omitting the condition.

Even according to Royal's version of the negotiations, however, it is by no means clear whether the reference to "your prices" was to Royal, to Plas-Ties, or to both.[1] The confusion is compounded by Royal's insistence that Plas-Ties and Royal were somehow one legal entity.

The first ground upon which the District Court decided that summary judgment should issue was that the Califor-

[1] For example, Johnson's affidavit of July 11, 1967, says: "[I]n order to protect my company, I personally discussed at great length the matter of prices on the plastic tie strips to be licensed and I insisted that the pricing structure established by the Plas-Ties Corporation be followed and recognized as a condition for granting the license; that in the course of these discussions, all the parties agreed to abide by Royal's pricing structures * * *."

nia parol evidence rule foreclosed consideration of Royal's evidence concerning the alleged oral condition. If the District Court was right, the conflicts in the evidence relating to the claimed oral condition are immaterial. If Royal cannot prove the oral condition, its case collapses, and St. Regis is entitled to judgment forthwith.

The parties agree that California law controls this issue. That law, as enunciated in Masterson v. Sine (1968) 68 Cal.2d 222, 65 Cal.Rptr. 545, 436 P.2d 561, does not exclude Royal's evidence. Neither counsel nor the District Court knew about the *Masterson* case, because the decision was not handed down until the day before the District Court filed the judgment.

■ Long before *Masterson* was decided, the principle was settled that the parol evidence rule affected only "integrated" writings, and that an integrated writing is a document which the parties intended as the complete and final embodiment of the terms of their agreement. (Pollyanna Homes, Inc. v. Berney (1961) 56 Cal.2d 676, 16 Cal.Rptr. 345, 365 P.2d 401; Hale v. Bohannon (1952) 38 Cal.2d 458, 241 P.2d 4; Restatement of Contracts (1932) §§ 228, 237.) The critical question is: Did the parties intend their writing to be an integration? *Masterson* held that evidence outside the face of the writing is always admissible for the purpose of answering that question. The parol evidence rule cannot be applied to exclude evidence tending to prove that the rule itself is inapplicable because the parties did not intend the writing to be an integration. *Masterson* overruled such cases as Heffner v. Gross (1919) 179 Cal. 738, 178 P. 860, upon which the District Court relied, that had confined the search for proof of the parties' intent to integrate to the face of the writing.

■ According to *Masterson*, the parol evidence rule has no effect until after the fact of intention to integrate is decided. If the decision on the issue is that the parties did not intend the writing to be an integration, in whole or in part, the parol evidence rule is not applicable at all. If the decision is that the parties did intend the writing to be a full and final embodiment of their bargain, the parol evidence rule operates to exclude all evidence that would add to or vary its terms. The District Court could not reach the parol evidence question until it resolved the threshold integration issue. The integration issue could not be decided on summary judgment, because the relevant evidence was conflicting. (E. g., Roll-Die & Mold Decorators, Inc. v. W. J. Voit Rubber Corp. (9th Cir. 1967) 387 F.2d 306; Bowman Steel Corp. v. Lumbermens Mutual Casualty Co. (3d Cir. 1966) 364 F. 2d 246.)

■ However, the District Court did not exclude Royal's evidence for all purposes. As an alternative ground for its decision, the District Court said it accepted Royal's evidence as true and held as a matter of law that no relief could be based on the oral agreement because the condition would violate the antitrust laws. Summary judgment was impermissible because Royal's own evidence, relevant to the antitrust issues, was conflicting. The District Court could not resolve those conflicts, absent trial, and we cannot do so on this record. (E. g., Britt v. Damson (9th Cir. 1964) 334 F. 2d 896, cert. denied (1965) 379 U.S. 966, 85 S.Ct. 661, 13 L.Ed.2d 560.) Even if the record were clear that Royal was a nonmanufacturing patentee that, as a condition of the license, fixed its licensee's prices of the patented product, the conclusion is not foregone that the agreement violates the antitrust laws. United States v. General Electric Co. (1926) 272 U.S. 476, 47 S.Ct. 192, 71 L. Ed. 362 permitted a patentee to license a competitor to produce and sell the patented product with a price limitation fixed by the patentee. The question whether a nonmanufacturing patentee falls within or without the *General Electric* rule has not yet been answered by the Supreme Court. United States v. New Wrinkle, Inc. (1952) 342 U.S. 371,

72 S.Ct. 350, 96 L.Ed. 417 and United States v. Line Material Co. (1948) 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701 did not overrule *General Electric,* and neither case considered the question thus hypothetically presented. We do not have to decide that question here, and we decline to do so.

Summary judgment was nevertheless appropriate upon one narrow ground: The complaint did not state a claim upon which relief can be granted because Royal could not terminate the licensing agreement without the joinder or consent of its colicensor Plas-Ties, and Plas-Ties neither joined in the termination notice nor otherwise assented to the termination. Denker v. Twentieth Century Fox Film Corp. (1961) 10 N.Y.2d 339, 223 N.Y.S.2d 193, 179 N.E.2d 336, 3 A.L.R.3d 1292; *see* 3 Black, Rescission and Cancellation 1362 (2d ed. 1929); 3 Walker, Patents § 430 (Dellers ed. (1937).) Royal does not quarrel with that rule of law. Rather, it argues that summary judgment, under Rule 12(b), Federal Rules of Civil Procedure, was improper because the questions whether Plas-Ties and Royal were separate corporate entities and whether Royal, not Plas-Ties, owned the know-how were triable issues of fact.

 Without inquiring into the *separateness issue for other purposes,* such as the legality of the claimed price-fixing condition, we have no difficulty in deciding that Royal and Plas-Ties were separate legal entities in respect of their licensing contract. Plas-Ties' identity was never obliterated by merger or dissolution after the agreement was signed and before Royal brought suit. The separate identities of a parent and its subsidiary, even a wholly owned subsidiary, will not be disregarded unless a recognition of their separateness, under the circumstances, would sanction a fraud or promote injustice. (*E. g.,* Luis v. Orcutt Town Water Co. (1962) 204 Cal.App.2d 433, 22 Cal.Rptr. 389; Marr v. Postal Union Life Ins. Co. (1940) 40 Cal.App.2d 673,

105 P.2d 649; *cf.* Hollywood Cleaning and Pressing Co. v. Hollywood Laundry Service, Inc. (1932) 217 Cal. 124, 17 P. 2d 709.) There is no showing at all that a refusal to permit Royal to disregard the separate identity of its subsidiary would *sanction a fraud or work injustice.* We agree with the District Court's conclusion that this record presents no legal basis for treating Plas-Ties as Royal's alter ego.

Royal's alternative argument is that ownership of the licensed know-how was a triable issue. The issue is material, it says, because if Royal, not Plas-Ties, owned the know-how, Plas-Ties had nothing to license, and it cannot be considered as a colicensor. The sole items in the record to which Royal points to support its claim that the evidence was conflicting are two statements in the recitals of the written license. Here are the statements: "ROYAL has designed and developed a product line of plastic strips and *is the owner* of United States Patent No. 2,767,113 * * * *and know how* pertaining to the design * * *." "POLLOCK is desirous of * * * acquiring a license under the patent rights and *know how owned by* ROYAL * * *." (Emphases added by Royal.) These recitals follow the preamble of the contract, stating, in pertinent part: "THIS AGREEMENT DUSTRIES, INC. and its subsidiary * * * is made between ROYAL IN-Plas-Ties Corporation (hereinafter called ROYAL) * * *." It is obvious that the statements Royal relies upon raise no inference whatever that Royal, not Plas-Ties, owned the know-how. Moreover, Royal's president testified that Plas-Ties developed the know-how before Royal bought into Plas-Ties, and Plas-Ties still owns the know-how for which it receives a royalty. There is no contrary evidence.

Royal had ample opportunity to obtain Plas-Ties' assent to termination before it filed suit. It had ample opportunity to join Plas-Ties as a plaintiff if Plas-Ties was willing to ratify Royal's acts.

It did neither. Its complaint stated no claim upon which relief could have been predicated.

The judgment is affirmed.

JAMES M. CARTER, Circuit Judge (concurring):

I concur in the result.

That portion of Judge Hufstedler's opinion which states that Royal could not terminate the licensing agreement without the joinder or consent of its co-licensor, Plas-Ties, is sufficient to support affirmance of the summary judgment and I concur in this portion of the opinion.

The discussion concerning the parol evidence problem is dicta, since the decision does not rest upon it.

I would further affirm the judgment on another ground, relied upon by the district court. Assuming Royal's contentions as to the price fixing agreement, the agreement violates the antitrust laws. The conflict between the antitrust laws and the rights arising under the patent monopoly have been discussed in many cases. The doctrine that a patent holder may fix the prices at which his licensee sells is a narrow one, and is limited to situations where the patent holder is also manufacturing and selling. United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926) is limited to a situation where the "patentee licenses another to make and vend and retains the right to continue to make and vend on his own account," 272 U.S. at 490, 47 S.Ct. at 197. *See* United States v. Line Material Company, 333 U.S. 287 (1948) at 310, 68 S. Ct. 550, 92 L.Ed. 701 and United States v. New Wrinkle, Inc., 342 U.S. 371 (1952) at 378, 72 S.Ct. 350, 96 L.Ed. 417.

In my opinion, the price fixing, assuming it existed, was illegal and in violation of the antitrust laws.