**AMERICAN INDUSTRIAL FASTENER CORP. et al., Plaintiffs,**

**v.**

**FLUSHING ENTERPRISES, INC., et al., Defendants.**

**Civ. A. No. C 72–1320.**

United States District Court,
N. D. Ohio, E. D.

July 2, 1973.

---

Richard M. Markus, Cleveland, Ohio, for plaintiffs.

Charles B. Gordon, Cleveland, Ohio, D. C. Roylance, Alfred N. Goodman, Roylance, Abrams, Berdo & Kaul, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Plaintiffs American Industrial Fastener Corporation (American) and its secretary-treasurer Arthur Herpolsheimer sue Flushing Enterprises, Inc. and James Enold, John Bashline, Ray Cope, and Charles Dravis for monetary damages arising from defendants' breach of contract. Plaintiffs also seek an accounting and preliminary and permanent

injunctions restraining all defendants from continuing to violate the contract as originally made. Without presently detailing all of their other defenses and counterclaims, defendants assert as a defense that the agreement sued on in the original complaint is "void and unenforceable" because it contains restrictions which "constitute a *per se* violation of the Sherman Act, 15 U.S.C. §§ 1 and 2." Those territorial and price restrictions as well as a claim of patent misuse also form the basis for defendants' treble damage counterclaim for violations of the Sherman Antitrust Act.

On these same grounds defendants have moved for summary judgment. The matter has been heard upon the pleadings, affidavit of Arthur Herpolsheimer, and briefs of the parties.

Herpolsheimer invented and on August 6, 1966, patented (Patent No. 3,-263,727) a "washer for threaded fasteners," and thereafter transferred to American "the exclusive right to sell said device throughout the world to retail accounts [and] for direct distribution to the general public." The "Manufacturing and Sales Contract Agreement" signed by the parties recites that American "has an option from . . . Herpolsheimer to purchase the industrial sales rights for said patented device."

Immediately following that clause, the agreement states the intention of patentee American (licensor) and Flushing (licensee), transferee of original licensees.

WHEREAS, LICENSOR is desirous of contracting with a group to manufacture and sell said patented device through a network of distributors, subdistributors and dealers in the North Eastern United States, and

WHEREAS, LICENSEE is desirous of obtaining the exclusive manufacturing and retail-industrial sales rights from LICENSOR.

NOW THEREFORE, for and in consideration of a Fifty Thousand ($50,000.00) Dollar loan to Arthur B. Herpolsheimer and LICENSOR together the parties hereto have agreed and do hereby agree as follows:

. . .

Then, the agreement grants to the individual defendants, as licensees, an "exclusive license" within a 14-state territory "for the exclusive manufacturing and sales [rights] (retail and industrial) of the patented device." Territorial boundaries must be "strictly adhered to . . . and any violation . . . may, at the discretion of LICENSOR, be deemed a breach in the contract." If any breach is not corrected within 30 days the agreement may be terminated.

The licensee was permitted to appoint sub-licensees (distributors) to manufacture and sell the patented device, provided the sub-licensee agreed to be bound by the territorial restrictions imposed on the licensee in the agreement between it and American. All sub-licensees were required to be approved by the licensor. In paragraph X of the agreement the "minimum requirements" are listed:

After ninety (90) days from this date, one Sub-Licensee (Distributor) must be established by LICENSEE each Thirty (30) days until territory is totally licensed. A minimum of ten (10) Sub-Licensees (Distributors) must be established within fifteen (15) months from todays date, minimum of Ten Thousand cost ($10,000.) dollars for each Distributor. Each Sub-LICENSEE (Distributor) must license ten (10) Sub-Distributors within fifteen months (15) from date of his approval from LICENSOR, minimum of five thousand ($5,000.) dollars for each sub-Distributor. LICENSEES must have a total of one hundred ten (110) Sub-Licensees within thirty three (33) months for a minimum total of ten (10) Distributors and one hundred (100) Sub-Distributors. Total minimum gross business of Distributor sales will be one hundred thousand ($100,000) dollars and five hundred thousand ($500,000.) dollars for Sub-Distributors.

Under the agreement American is entitled to receive 10% "of the total cost to any Sub-Licensee" as a "royalty" but further subdividing it as follows: 4% to Herpolsheimer for his patent during the life of the agreement; 2% finders fee; 4% to American for the manufacturing and sales rights for the life of the agreement. In addition, American is entitled to receive for its continuous assistance 1/3% of the total cost to any sub-licensee; and 10% "royalty of LICENSEES total gross sales to any account or sub-licensee." Two percent of the revenue derived from the aforementioned provisions would form the basis from which the $50,000 loan, made to Herpolsheimer by the individual defendants, would be repaid.

Thereafter, in paragraphs XV, XVI, and XVII the agreement provides:

This agreement shall be in force for a ten (10) year period . . . .

LICENSOR will determine the (suggested retail price) price of the patented device at all times and at every level.

New policy and price changes will be sent to LICENSEE from time to time concerning sales, product improvement and general information from other LICENSEES. This will be to assist in upgrading the Licensees' business. LICENSEES agree that he will adhere to new policy and price changes.

## I.

Squarely presented in this case and necessary for disposition of the first ground of defendants' summary judgment motion is the question expressly left open in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 379 n. 6, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), *i.e.*, whether a patentee or transferee thereof has any greater right than a nonpatentee manufacturer in controlling or restricting the methods of distribution (territorial restrictions) in the hands of a purchaser of a patented product. *See also*, Keeler v. Standard Fold-

ing Bed Co., 157 U.S. 659, 666, 15 S.Ct. 738, 39 L.Ed. 848 (1895).

Alleging that the first sale exhausts the patent monopoly, defendants contend that "within its four corners" the "Manufacturing and Sales Contract Agreement" can be found a *per se* violation of the Sherman Act. In sequential order, defendants premise their ultimate contention on these intermediate conclusions. First, the agreement *requires* the licensee to *sell* the patented product to the distributor. This sale exhausts the protection of the patent privilege. Thus, having parted with ownership of the product the manufacturing licensee may not impose any restrictions upon the second sale (resale) of the product. Since the licensee may not impose resale restrictions on the second sale of the product, then neither may the patentee by means of its agreement with the licensee. Second, the resale of the product by distributors to sub-distributors is on the face of the agreement (paragraph III) territorially restricted. Therefore, the validity of the agreement, tested on its face, is governed by the principles set forth in United States v. Arnold, Schwinn, *supra* which holds

. . . where a manufacturer *sells* a product to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results. 388 U.S. at 379, 87 S.Ct. at 1865.

However, plaintiff distinguishes *Schwinn* because it involved a territorial restraint upon resale but did not involve a patented product. Present in this case are both territorial restraints on resale and a patented product.

The plaintiff contends that United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 affirmed the right of a patentee to control the distribution of his product by dividing markets among his distributors. In the second part of this two-part decision the Court actually goes no further than to uphold the patentee's (GE's) right to restrict the prices at which the licensee

(Westinghouse) sells the patented product.

The Court in General Electric, *supra* at 489, 47 S.Ct. at 196, however, also recognized that

It is *well settled* . . . that where a patentee makes the patented article, and sells it, he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee's rights. [Emphasis added.]

In similar words, that concept was restated in United States v. Univis Lens Co., 316 U.S. 241, 252, 62 S.Ct. 1088, 1094, 86 L.Ed. 1408 (1942):

The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers.

*Univis* involved a three-tiered vertical distribution system in which the patentee, by contract, designated the resale prices of lens blanks purchased from the licensee and the permissible customers to which the licensee could resell the patented product. Thus, *Univis* involves a distribution system similar to that of American Fastener in the present case. Yet *Univis*, like *General Electric, supra* involves price restrictions, not territorial restrictions. Hence, *Univis* is not directly controlling.

The search for resolution of the motion for summary judgment proceeds next to 35 U.S.C. § 261, on which the plaintiffs strongly rely. This provision of the patent laws provides:

Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.

An attempt must be made to reconcile 35 U.S.C. § 261 with the Sherman Act, 15 U.S.C. § 1 as judicially construed in *Schwinn, supra*. In seeking this reconciliation guidance is found in the following decisions. In United States v. Masonite Corp., 316 U.S. 265, 280, 62 S.Ct. 1070, 1078, 86 L.Ed. 1461 (1942), citing *Univis, supra*, the Court stated:

Since patents are privileges restrictive of a free economy, the rights which Congress has attached to them must be *strictly construed* . . . . [Emphasis added.]

Similarly, United States v. New Wrinkle, Inc., 342 U.S. 371, 378, 72 S.Ct. 350, 96 L.Ed. 417 (1952), citing United States v. Line Material Co., 333 U.S. 287, 308, 68 S.Ct. 550, 561, 92 L.Ed. 701 (1948) gives further guidance:

The possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly.

And, in Simpson v. Union Oil Co., 377 U.S. 13, 24, 84 S.Ct. 1051, 1058, 12 L. Ed.2d 98 (1964) the Court stated:

The patent laws which give a 17-year monopoly on "making, using, or selling the invention" are *in pari materia* with the antitrust laws and modify them *pro tanto*. That was the *ratio decidendi* of the *General Electric* case. See 272 U.S., at 485 [47 S.Ct. 192, 71 L.Ed. 362]. We decline the invitation to extend it.

Further direction is found in *General Electric, supra* 272 U.S. at 490, 47 S.Ct. at 197 wherein the Court states that a patentee's limitations on his immediate licensee are valid

. . . provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly.

*See also*, General Pictures Corp. v. Western Elec. Co., 305 U.S. 124, 127, 59 S.Ct. 116, 83 L.Ed. 81 (1938).

■ After a sale of the patented product to a licensee, with transfer of dominion and control over the product, Section 261, strictly construed as these decisions mandate, permits a patentee to

impose on the licensee territorial restrictions on the distribution of the product. But does a strict construction of the section permit the patentee to impose territorial restrictions on subsequent sales made after the first sale?

The first sentence of the second paragraph of Section 261 reads:

> Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.

Declaratory only, this sentence permits the transfer of ownership of any interest in a patent by assignment in writing. The second sentence reads:

> The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.

This sentence permits each of the parties named therein "to convey an exclusive right" to a specified territory, but not in succession. The word "or" in the second sentence is used twice and indicates that the sentence is to be read in the disjunctive. Thus, no inference can be drawn from the statute itself that territorial exclusiveness would run with and surround the patented product at each subsequent step into the hands of the ultimate consumer. Strictly construed, it does not permit the extension of "exclusivity" to its resale by a licensee to the distributor. It only contemplates as to its first sale an exclusive right per "specified part of the United States."

No support for the plaintiffs' position can be drawn from Becton, Dickinson & Co. v. Eisele & Co., 86 F.2d 267, 269 (6 Cir. 1936); United States v. Crown-Zellerbach Corp., 141 F.Supp. 118, 127 (N. D.Ill.1956); and Brownell v. Ketcham Wire & Mfg. Co., 211 F.2d 121, 128–129 (9 Cir. 1954). None of those cases considered whether territorial restrictions imposed by a patentee or assignee thereof upon the second sale (resale) of the patented product are insulated by 35 U.

S.C. § 261 from the proscriptions of the Sherman Act.

An exclusive right is vested in the licensee (defendants herein) to manufacture and vend the patented product in the Northeastern United States. Once the licensee sells the patented product, restrictions on its resale would violate the ancient rule against restraints on alienation, and may not be imposed. *Schwinn, supra,* 388 U.S. at 380, 87 S.Ct. 1856.

This construction of Section 261 takes nothing from the patentee to which he is otherwise reasonably entitled. Section 261 is intended to benefit patentees, not licensees or their vendees. Here, plaintiffs seek to extend the "exclusiveness" of the statute to vendees of the licensee's vendees—parties twice removed from the patentee. Giving a strict construction to the benefits bestowed by that statute, such extension is not warranted.

Furthermore, such extension is not reasonably necessary to "secure pecuniary reward for the patentee's monopoly," *General Electric, supra,* 272 U.S. at 490, 47 S.Ct. at 197. It may be that the absence of secondary territorial restraints will stimulate competition and thereby decrease the value of the license. Yet the prime benefit protected by the statute is the royalty received from the sale of the patented product. Even without exclusiveness extended the patentee is assured of his royalty because no matter who makes the sale or in which territory it is made the patentee is entitled to his royalty. Extension of territorial restrictions to the second vendee can only serve to decrease competition at that level and artifically maintain higher prices. Its extension does not, in any meaningful sense, promote greater security of the patentee's reward for his invention; and thus, is not reasonably necessary to secure that reward.

Having concluded that vertical territorial restrictions beyond the first sale are not sanctioned by 35 U.S.C. § 261, there remains to be considered whether such restrictions are *per se* violations of

Section 1 of the Sherman Act, 15 U.S.C. § 1.

There are no cases that hold that vertical territorial restrictions on sales beyond the licensee's purchase of the patented product are *per se* invalid under the Sherman Act. But strong support for such a conclusion is found in the following cases.

In Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F. Supp. 1, 29 (E.D.Pa.1958) aff'd 268 F. 2d 395 (1959), a pre-*Schwinn* case, the Court invalidated a use restriction imposed by the patentee on the vendee of a patented product. While recognizing the possible distinctions in prior cases that court concluded,

> Nevertheless, the consistency with which the Supreme Court has asserted for over half a century that the patent laws afford no authority for a patentee to control the use to which a patented article may be put after the patentee has sold it, and the failure of the Supreme Court to qualify in any way the reach of this principle make me disinclined to write exceptions into the principle at odds with its inherent comprehensiveness.

In Hensley Equipment Co. v. Esco Corp., 383 F.2d 252 (5 Cir. 1967), a post-*Schwinn* case, the Fifth Circuit found that a customer restriction upon resale imposed by the patentee as part of the contract between it and its licensee was *per se* a violation of the Sherman Act.

More direct support is drawn from Ansul Company v. Uniroyal, Inc., 306 F. Supp. 541, 559 (S.D.N.Y.1969) aff'd 448 F.2d 872 (2 Cir. 1971). There the district court stated:

> Although there was a time when doubt existed as to whether a manufacturer could lawfully restrict its distributors to certain territories . . . [citations] any such doubts were laid to rest by the Supreme Court's 1967 decision in . . . *Schwinn* . . . holding that such restrictions are *per*

*se* violations of the Sherman Act . . .. . . . As in the case of pricing arrangements a valid patent does not authorize the holder to impose such unlawful territorial or customer restrictions upon purchasers of patented product.

The evil sought to be remedied in that case was resale price fixing and the court found the territorial restrictions implemented that scheme. However, the district court made no attempt to limit its ruling. On appeal, that ruling, assigned as a separate error (448 F.2d at page 881), was affirmed.

Finally, this court accepts and relies upon a concept used in United States v. Topco, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) as support for a *per se* rule:

> The fact is that courts are of limited utility in examining difficult economic problems.

Continuing that concept in a footnote, the Court wrote:

> Without the *per se* rules, businessmen would be left with little to aid them in predicting in any particular case what courts will find to be legal and illegal under the Sherman Act.

Royal Industries v. St. Regis Paper Co., 420 F.2d 449, 451 (9 Cir. 1969) is one example of the uncertainty of which *Topco* speaks.

■ It is, therefore, concluded that footnote 6 in *Schwinn, supra* is not to be construed as altering the traditional rule against restraints on alienation of all articles, including patented products. In the words of *General Electric, supra* 272 U.S. at 489, 47 S.Ct. 192, 71 L.Ed. 362 once a manufacturing licensee sells a patented product the patentee can "exercise no future control" over the territory in which the purchaser may sell the patented product. It has passed beyond the scope of the patentee's rights. Thus it is concluded that the provision in the agreement that binds distributors to the territorial restraints imposed by the patentee is *per se* invalid as a contract in

restraint of trade or commerce within the meaning of the Sherman Act, 15 U.S.C. § 1.

Plaintiffs' representation that they seek only "to compel [the defendants] to comply with the territorial restrictions imposed upon them by the license agreement" is insufficient to preclude a grant of partial summary judgment. Defendants directly challenge the validity of territorial restraints imposed by the patentee upon the distributors' resale of the patented product. Yet, nowhere do plaintiffs represent that they have not enforced, are not enforcing or will not enforce all the territorial restrictions.

The agreement was executed on September 27, 1971, more than four years after *Schwinn, supra* was decided. Its restrictive territorial provisions pervade significant parts of the licensing agreement. Therefore, questions concerning whether it was enforced need not await exploration at trial. Acquisition of a sub-license (distributorship) was conditioned upon acceptance by the sub-licensee (distributor) of the territorial restriction contained in the agreement. Moreover, prior approval of the distributor by the licensor is a condition precedent to the grant of a distributorship. Additionally, the licensor had a monetary interest (see Paragraphs VI and X) in securing restricted territories.

Under Rule 56(e), Federal Rules of Civil Procedure plaintiffs must set forth specific facts creating a genuine issue in order to preclude a grant of summary judgment against them. Upon the present record, and for the reasons previously stated, plus the additional consideration that businessmen do not generally use surplus language in contracts, it is concluded that a summary judgment under the fifth defense, paragraph 14 is granted insofar as it is claimed that the territorial restrictions of the agreement are *per se* invalid under Section 1 of the Sherman Act.

## II.

In paragraph 15 of the Fifth Affirmative Defense, defendants assert that the contract provides for illegal price fixing as a matter of law. The contract provides in Paragraph XVI:

PRODUCT PRICE; LICENSOR will determine the (suggested retail price) price of the patented device at all times and at every level.

Defendants maintain that the language in Paragraph XVI is a *per se* violation of the Sherman Act. Thus, they maintain that Herpolsheimer's affidavit does not create any ambiguity in the language of the agreement and summary judgment is appropriate on this ground.

The agreement is governed by California law. (Paragraph XIX.) In a closely analogous case the Ninth Circuit, construing California law, in Royal Industries v. St. Regis Paper Co., 420 F.2d 449, 452, 453 (9 Cir. 1969), stated:

The critical question is: Did the parties intend the writing to be an integration? . . . The parol evidence rule cannot be applied to exclude evidence tending to prove that the rule itself is inapplicable because the parties did not intend the writing to be an integration.

. . . . . . .

According to *Masterson* [Masterson v. Sine (1968) 68 Cal.2d 222, 65 Cal. Rptr. 545, 436 P.2d 561] the parol evidence rule has no effect until after the fact of intention to integrate is decided. If the decision on the issue is that the parties did not intend the writing to be an integration, in whole or in part, the parol evidence rule is not applicable at all. If the decision is that the parties did intend the writing *to be a full and final embodiment' of their bargain,* the parol evidence rule operates to exclude all evidence that would add to or vary its terms. . . . The integration issue could not be decided on summary judgment, because the relevant evidence was conflicting. [Emphasis added.]

The following sentences in Herpolsheimer's affidavit are uncontradicted:

I at no time expressed a desire or intention on the part of plaintiffs to firmly set the retail sales price of the

**40**

patented item. Retailers were to be free, and even encouraged, to discount the items so that sales would be enhanced and consumer acceptance increased.

An integrated document is one "which the parties intended as the complete and final embodiment of the terms of their agreement." *Royal Industries, supra* at 452. As shown, the parol evidence rule, as applied in California, does not preclude evidence "outside the face of the writing" to show that the document is not the final embodiment of the terms of their agreement. In this respect, Herpolsheimer's affidavit is sufficient to create a genuine issue and thus preclude summary judgment on this ground.

Additionally, a further circumstance precludes a grant of summary judgment on this ground. Herpolsheimer's affidavit states:

Plaintiffs have not, at any time before or after defendants began manufacturing the patented washer, attempted to dictate the prices at which the patented washers were sold to sub-licensees, distributors, retailers, or the public.

This assertion is uncontradicted by defendants. Moreover and also uncontradicted, his affidavit further states:

At no time did I indicate to defendants that American . . . desired to fix retail sales prices or to discipline any licensee, sub-licensee, distributor or retail store for the sales price at which the patented washers were to be sold.

Coupled with the question of integration this further question of enforcement creates a genuine issue of material fact because suggested resale prices are permissible if no "steps are taken with the purpose or effect of inducing distributors or dealers to adhere to suggested resale prices." *Ansul Co., supra,* 306 F. Supp. at 558.

For the foregoing reasons summary judgment is inappropriate on this ground and must be denied.

### III.

Finding the territorial restrictions of the agreement violative of the Sherman Act does not end all inquiry. Defendants raise that violation by way of defense to a suit for breach of contract and, as noted, contend the agreement is "illegal, void and unenforceable." As a defense to an action founded on contract, the plea of illegality based on a violation of the Sherman Act is disfavored. Kelly v. Kosuga, 358 U.S. 516, 518, 79 S.Ct. 429, 431, 3 L.Ed.2d 475 (1959).

As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court. This has been notably the case where the plea has been made by a purchaser in an action to recover from him the agreed price of goods sold. [Citing Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L. Ed. 679 (1902); D.R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U. S. 165, 35 S.Ct. 398, 59 L.Ed. 520 (1915).]

While recognizing the authority of *Kelly, supra,* the Court of Appeals for the Sixth Circuit in Associated Press v. Taft-Ingalls Corp., 340 F.2d 753, 769 (1965) remarked that the Supreme Court in *Kelly, supra,* 358 U.S. 520, 79 S.Ct. 429 went on to note the inapplicability of this view "where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act . . ." The Sixth Circuit then proceeded to deny the enforcement of an AP services contract, determined to be an illegal tying arrangement in violation of Section 1 of the Sherman Act. However, this defense was allowed

. . . not to defeat an obligation for services received, but to avoid paying weekly assessments for two years after appellant had ceased publication of Times-Star and had sold its newspaper.

Recently in Atlantic Richfield Co. v. Malco Petroleum, Inc., 471 F.2d 1258,

1260 (6 Cir. 1972), the Court of Appeals observed:

> This Circuit has applied the *Kelly* distinction between contracts violative of the antitrust law in and of themselves and separable legal transactions which are valid [citing *Associated Press, supra.*]

In *Atlantic Richfield, supra* at 1261 the Court ruled:

> The appellant will not be allowed to use the antitrust law to avoid paying its just debts. If there was an illegal tying agreement and if the distributor here was injured, there is an adequate remedy under the provisions of the antitrust laws.

To the extent that plaintiffs seek an injunction "restraining defendants from making any sales of any washers for threaded fasteners outside of the territory in the Agreement," and which will enforce the territorial restrictions of the agreement, previously determined to be a *per se* violation of Section 1 of the Sherman Act, this relief will not be granted. Plaintiffs' request for an accounting and an order of payment "over to plaintiffs [of] such sums as shall be ascertained to be due them from said defendants" cannot now be determined as a matter of law to be relief which would enforce the illegal territorial restrictions of the agreement. One of the elements of commissions provided in the agreement, and payable to licensor during the life of the agreement, is a "ten (10%) per cent royalty of LICENSEES total gross sales to any account or sub-licensee." The patent covering the fasteners manufactured under the licensing agreement is presumed valid. This distinguishes the present case from Katzinger Co. v. Chicago Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374 (1947) which held patent royalties unseverable from an agreement held invalid because of illegal price fixing provisions, assuming the patent should thereafter be declared invalid.

On the present record this court concludes that the illegal territorial restrictions may be severable from the remainder of the contract, and assumes that the claim for commissions may be enforceable. Hence, a summary judgment that the entire agreement is void and unenforceable is now unwarranted and the motion seeking such judgment is denied.

In addition, the defendants' claim of price fixing remains for trial. Defendants also raise the defense of patent misuse as precluding enforcement of the agreement against them. Adjudication of this defense must also await trial. For these further reasons it is not now appropriate to determine the extent, if at all, to which plaintiff may enforce the agreement.

Consistent with the foregoing memorandum defendants' motion for summary judgment is granted in part and denied in part.

It is so ordered.