510 F.Supp. 581 (1981)
ROYAL EXCHANGE ASSURANCE OF AMERICA, INC., and Lee Torgerson Machinery Company, Plaintiffs,
v.
SS PRESIDENT ADAMS, her engines, tackle, apparel, furniture and equipment, In Rem; and American President Lines, Ltd., In Personam, Defendants and Third Party Plaintiffs,
and
Port of Tacoma, a municipal corporation, Third Party Defendant.
No. C79-556B.
United States District Court, W. D. Washington.
February 27, 1981.
*582 Michael H. Williamson of Madden, Poliak, MacDougall & Williamson, Seattle, Wash., for plaintiffs.
David Danielson of Lane, Powell, Moss & Miller, Seattle, Wash., for American President Lines.
Richard Martens of Murray, Dunham & Waitt, Seattle, Wash., for Port of Tacoma.

MEMORANDUM OF DECISION
BEEKS, District Judge.
Torgerson Machinery Co. (Torgerson) shipped rock-crushing machinery from Karachi, Pakistan, to Tacoma, Washington, aboard the SS PRESIDENT ADAMS, owned and operated by American President Lines (APL). Torgerson had purchased the machinery at a point inland from Karachi, and the machinery was transported to Karachi by rail. While the cargo awaited loading onto the PRESIDENT ADAMS, some meetings were held between Ikramul Haq Shamin, APL's local agent, and Lee Torgerson and Richard Bergland, president and an employee of Torgerson, respectively. The topics discussed at these meetings are in dispute. A mate's receipt (Exhibit A-7) was given to the shipper upon loading on board the PRESIDENT ADAMS, and this was later exchanged for the bill of lading (Exhibit 1). The equipment was unloaded in Tacoma by longshoremen employed by APL. Port of Tacoma employees then moved the equipment to another location at the Port of Tacoma where Torgerson could take delivery.
The equipment was received in Tacoma in an allegedly damaged condition. The deposition of the plaintiff's surveyor, Jack Skewes, indicates that a substantial portion of the damage was caused by APL's discharging stevedores. Another portion of the damage is alleged to have been caused by Port of Tacoma terminal workers.
Torgerson was insured for damage to its cargo by Royal Exchange Assurance of America, Inc. (Royal Exchange). Royal Exchange paid Torgerson for a portion of the loss, $120,000, and two documents were executed by Torgerson: a "Release and Subrogation Receipt" purporting to "assign all rights and remedies in respect to the damage" to William H. McGee & Co. (unnumbered exhibit to Affidavit of David Danielson) and an "Agreement" retaining Royal Exchange's attorneys to act also as Torgerson's attorneys in pursuing Torgerson's remedies against APL, Torgerson also agreeing "not to pursue any claim against (APL's stevedores) either directly or indirectly in the course of the legal proceedings against American President Lines and others." (Exhibit A-8). Both documents are dated July 23, 1979.
APL has liability insurance for its stevedoring operations through Marine Indemnity Insurance Company of America (Marine Indemnity). The Port of Tacoma is named as a coinsured for its terminal operations under Endorsement No. 9 to said policy (Exhibit 2, Affidavit of David Danielson).
APL moved to dismiss the complaint of Royal Exchange and Torgerson, to amend the pretrial order, and to continue the trial which was nonetheless held on November 18, 1980, limited, however, to the subject of whether the on-deck stowage of some of the cargo amounted to a deviation. The Port of Tacoma joined in this motion and moved for an order disqualifying plaintiffs' counsel. By this opinion the court decides the motion to dismiss and the issue of deviation.

*583 MOTION TO DISMISS
This motion is supported by affidavits and exhibits so must be considered a motion for summary judgment under F.R.Civ.P. 56. See F.R.Civ.P. 12(b). Defendant and third party defendant assert that the complaint must be dismissed because an insurer may not subrogate against its own insured. They allege that Royal Exchange is to be considered the same entity as Marine Indemnity and that therefore Royal Exchange may not sue APL or, indirectly, the Port of Tacoma in subrogation.
Plaintiffs do not dispute the following facts set forth by the Port of Tacoma: 1) that Marine Indemnity and Royal Exchange both have their administrative offices at 4 World Trade Center, New York, N.Y. and use the same mailing address and telephone number; 2) that the affairs of both companies are directed by William H. McGee & Company, Inc.; 3) that Marine Indemnity and Royal Exchange have the same President (Kenneth G. T. Drysdale), Vice-President (Robert Howe), Secretary (A. Robert Tremaine) and Treasurer (George Walzauck); 4) that Marine Indemnity and Royal Exchange have nine directors in common; 5) that William H. McGee & Co., Inc., has the same office, mailing address and telephone number as both Royal Exchange and Marine Indemnity; and 6) that Kenneth G. T. Drysdale is the President of William H. McGee, in addition to Royal Exchange and Marine Indemnity.
The court also finds pertinent a letter from plaintiffs' attorneys to an official of William H. McGee & Co. (Exhibit 4, Affidavit of David Danielson) indicating that the attorneys had negotiated a settlement of the insurance claim between Torgerson and Royal Exchange, Torgerson's insurer, extracting an agreement not to sue Marine Indemnity, APL and Port of Tacoma's insurer:
We were successful in obtaining your assureds agreement to not pursue any possible uninsured claim against the stevedore (APL's) who is also a McGee insured. In this regard we feel that subrogation should be pursued with the understanding that we not attempt any recovery from the stevedores.
Plaintiffs make no showing in opposition to the assertion that Royal Exchange, Marine Indemnity and McGee are one entity, and the court therefore finds no genuine issue of material fact remaining. Where there is a near identity between corporations, their separate existences can be disregarded in order to prevent injustice to a third party. Houston Oil Field Material Company v. Stuard, 406 F.2d 1052, 1054 n.1 (5th Cir. 1969).
Treating Royal Exchange and Marine Indemnity as one, the issue remaining is whether an insurer which had paid an insured shipper on a cargo damage policy may subrogate against a carrier whose stevedoring operations it insures under an unrelated liability policy, for damage allegedly caused to the cargo in the carrier's capacity as carrier. Clearly there can be no recovery for damage caused by insured activities such as APL's stevedoring operations, and the Port of Tacoma's terminal operations. Employers of Wausau v. Purex Corp., 476 F.Supp. 140, 143 (E.D.Pa.1979) ("If Employers recovered in this subrogation action against Purex, it would be reimbursed for the loss which Purex paid it premiums to cover.")
Plaintiff relies on two cases to support subrogation, Turner Construction Co. v. John B. Kelly Co., 442 F.Supp. 551 (E.D.Pa. 1976) and Public Service Company of Oklahoma v. Black & Veatch, 328 F.Supp. 14 (N.D.Okl.1971). In both the court held that subrogation was allowed against a negligent defendant covered "as their interests may appear" by the subrogating insurer under the insured's policy for property damage. In neither case did the coinsured defendant have any liability coverage under the policy, the key factor present in the case at bar.
The public policy reasons against permitting subrogation against one's own liability insured are set out in Home Insurance Co. v. Pinski Brothers, Inc., 160 Mont. 219, 500 P.2d 945 (1972), a case with facts strikingly similar to the case at bar:

*584 To permit the insurer to sue its own insured for a liability covered by the insurance policy would violate ... sound public policy. Such action, if permitted would (1) allow the insurer to expend premiums collected from its insured to secure a judgment against the same insured on a risk insured against; (2) give judicial sanction to the breach of the insurance policy by the insurer; (3) permit the insurer to secure information from its insured under the guise of policy provisions available for later use in the insurer's subrogation action against its own insured; (4) allow the insurer to take advantage of its conduct and conflict of interest with its insured; and (5) constitute judicial approval of a breach of the insurer's relationship with its own insured.
500 P.2d at 949.
Atlas Assurance Co., Ltd. v. Harper, Robinson Shipping Co., 508 F.2d 1381 (9th Cir. 1975) in which subrogation was denied even where there was no liability coverage is controlling. There, Atlas, the insurer, gave the shipper "warehouse to warehouse" property loss coverage, but not liability coverage. The shipper shipped to consignee via carrier on an "FIO" (free in and out) basis and agreed to indemnify the carrier for any liability for damage done by stevedores. When such damage occurred, Atlas paid consignee under the policy, then sued the carrier in subrogation. Since the carrier then impleaded the shipper for indemnity, the court held this was equivalent to a direct suit by Atlas against its insured, the shipper. The court said: "Atlas is clearly attempting to sue its Assured, albeit in a circuitous manner, and the equity of subrogation will be denied to Atlas under the familiar doctrine that subrogation does not invest the underwriter with a right to override its obligation to its Assured." Id. at 1389.
The fact that the subrogation claim of Royal Exchange is in excess of the policy coverage of APL and Port of Tacoma is irrelevant. Public policy forbidding subrogation against one's own insured is based on the fact of insurance, not on the amount of coverage. This was the court's holding in Stafford Metal Works, Inc. v. Cook Paint & Varnish Co., 418 F.Supp. 56 (N.D.Tex.1976). Continental was Stafford's fire insurer and Cook's liability insurer. Cook supplied Stafford with defective insulation resulting in fire damage to Stafford. Continental paid Stafford $145,000 under its fire policy, and then defended Cook in Stafford's suit against Cook, settling the claim for $163,700. Cook's policy limit was $100,000, so the last $63,700 was uninsured. Continental then attempted to sue Cook in subrogation to recover amounts Continental paid under its fire policy to Stafford. The court held that Continental could not subrogate against its own liability insured, even for the amount above Cook's policy limit.
As a matter of law, Royal Exchange may not recover in subrogation against its own insureds, APL and the Port of Tacoma. Summary judgment against Royal Exchange is therefore granted, and Royal Exchange is dismissed as a party plaintiff. On the record provided, however, the court cannot say that Torgerson lost its right to bring an uninsured claim by its acceptance of payments from Royal Exchange. Therefore, the motion to dismiss is denied as to Torgerson, and the court must now consider the issue of deviation.

TRIAL ON DEVIATION
The issue bifurcated for trial was whether APL's carriage of some of the cargo on deck amounted to a deviation from the contract of carriage. It is asserted that if a deviation is found, the carrier loses its defenses given by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. As explained below, the court finds there was no deviation, so the issue of effect of deviation is not met.
The cargo involved was shipped under a "clean" bill of lading, without any indication that it was to be carried on deck. Cargo transported on deck without such indication is a deviation from the contract of carriage. See Searoad Shipping Co. v. E. I. duPont de Nemours and Co., 361 F.2d 833 *585 (5th Cir. 1966), cert. den. 385 U.S. 973, 87 S.Ct. 511, 17 L.Ed.2d 436 (1966); Gilmore & Black, The Law of Admiralty § 3-42 (2d ed. 1975). The clean bill of lading may be overlooked, however, if an agreement or custom to carry on deck is shown. The Delaware, 81 U.S. (14 Wall.) 579, 605, 20 L.Ed. 779, 784 (1872); The Margaret Lykes, 57 F.Supp. 466, 469 (E.D.La.1944). This raises the problem of whether parol evidence is admissible to show such an agreement or custom which contradicts the clean bill of lading. The general rule as laid down by the United States Supreme Court in The Delaware, supra, is that parol evidence is inadmissible to show an agreement to carry on deck when the contract of carriage is integrated into a clean bill of lading. The parol evidence rule, however, affects only "integrated" writings. Royal Industries v. St. Regis Paper Company, 420 F.2d 449, 452 (9th Cir. 1969). An integrated writing is a document intended by the parties to be the complete and final embodiment of the terms of their agreement. Id. The court finds that there was no integration here, and that none was intended. While the contract of carriage was the subject of negotiation, the terms printed on the bill of lading were not. In fact, there is no evidence that the bill of lading was even mentioned in the negotiations. The parol evidence rule is therefore inapplicable.
Was there an agreement between Torgerson and APL to carry some cargo on deck? The court credits and believes the testimony of APL's agent in Karachi, Shamin, that discussions of the stowing arrangement were held at two meetings with representatives of Torgerson. Shamin stated that a portion of the cargo had to be stowed on deck because of its size and shape and neither representative of Torgerson expressed any objection to the arrangement. The mate's receipt, showing on-deck stowage, was also accepted without objection by Torgerson upon delivery of the cargo to the vessel. There is no doubt that this acquiescence created an agreement that a portion of the cargo be carried on deck. Therefore, there was no deviation, and it is unnecessary to decide whether on-deck stowage was customary.