MERCHANTS' & MINERS' TRANSP. CO. v. ROBINSON-BAXTER-DIS-
SOSWAY TOWING & TRANSP. CO. et al.    GENERAL CHEMICAL
CO. v. MERCHANTS' & MINERS' TRANSP. CO. et al.    MERCHANTS'
& MINERS' TRANSP. CO. et al. v. GILDERSLEEVE et al.

(Circuit Court of Appeals, First Circuit.    November 29, 1911.)

Nos. 920, 921, 922.

**1.** COLLISION (§ 66*)—STEAM VESSELS MEETING—FAULT.

A finding *held* supported by the evidence that a steamer was charge-
able with contributory fault for a collision with the tow of a meeting
tug on the Providence river on a clear moonlight night for failing to
sooner reverse when it became evident that the tug, although having
agreed to pass port to port, was keeping to the side of the channel on
her left hand in violation of the rules.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 84; Dec. Dig.
§ 66.*

Collision with or between towing vessels and vessels in tow, see note
to 100 C. C. A. 581.]

**2.** SUBROGATION (§ 1*)—NATURE OF RIGHT—TECHNICAL OBJECTIONS.

The doctrine of subrogation is one of equity and not of the common
law, and, in its application, no attention should be paid to technicalities
which are not of an insuperable character, but the broad equities should
always be sought out as far as possible.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. §§ 1, 2; Dec.
Dig. § 1.*]

**3.** INSURANCE (§ 606*)—PAYMENT OF LOSS—SUBROGATION OF INSURER—"AS-
SURED."

A towing company, owner of a tug and barges, procured an open pol-
icy of insurance "for the account of whom it may concern" on all lawful
goods on board barges owned by it "against any and all risks and perils
of fire and inland navigation and transportation, property of the assured
or held by them in trust or custody as freighter, forwarder, bailee or
common carrier." In accordance with the provisions of the policy, the
company procured a certificate thereunder covering the cargo of one of
its barges, "loss if any payable only to the order of" the owner of such
cargo. Under an agreement between them, it paid the premium on the
certificate, and added the amount to the freight.   The certificate also
contained the following: "It is agreed that upon the payment of any loss
or damage the insurers are to be subrogated to all the rights of the
assured under their bills of lading or transportation receipts to the ex-
tent of such payments."   While in tow of the company's tug the barge
was sunk in a collision, and the cargo was a total loss; the tug and the
second vessel both being held in fault for the collision.   The insurer
paid the loss to the cargo owner.   *Held*, that within the meaning and
intent of the certificate the cargo owner, which paid the premium, was
the "assured," and that the insurer was entitled to be subrogated to its
right of recovery as against both vessels.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1506; Dec.
Dig. § 606.*

For other definitions, see Words and Phrases, vol. 1, pp. 591, 592.]

**4.** DIVISION OF DAMAGES.

The Sterling, 106 U. S. 647, 1 Sup. Ct. 89, 27 L. Ed. 98, applied in
dividing damages as between two tort-feasors in a collision case.

Appeals from the District Court of the United States for the Dis-
trict of Rhode Island.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit for collision by the Merchants' & Miners' Transportation Company against the Robinson-Baxter-Dissosway Towing & Transportation Company and others. Decree for respondents and libelant appeals. Affirmed. Suit by the General Chemical Company against the Merchants' & Miners' Transportation Company and others. Decree for respondents and libelant appeals. Reversed. Suit by Louis Gildersleeve and others against the Merchants' & Miners' Transportation Company and others. Decree for libelants, and respondents appeal. Affirmed.

Frank Healy (Daniel H. Hayne, on the brief), for Merchants' & Miners' Transp. Co.

Samuel Park (Carpenter & Park, on the brief), for Robinson-Baxter-Dissosway Towing & Transportation Co.

De Lagnel Berier (James J. Macklin, on the brief), for General Chemical Co. and others.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. These appeals arose out of a collision on the Providence river, on a bright, moonlight, calm night, between the steamer Powhatan and a barge in tow by a tug owned by the Robinson Towing Company, named in these proceedings. The Powhatan was going out, and the tug and tow coming in. The tow consisted of two barges, one the Ira L. Allen towed on a line about 300 feet aft of the tug, and the other the Elheurah, towed on a line after the Allen. The Powhatan came in collision with the Allen, and thereupon the Elheurah caught up with the Allen, and by the collision between the two barges both were sunk.

[1] There is no question about the fault of the tug, and the main question is in regard to the alleged fault of the Powhatan. The essential facts are stated in the following extract from the opinion of the learned judge of the District Court:

"The Powhatan was going at slow speed under one bell, probably about six or seven miles an hour. After passing Fuller's Rock, and just before reaching buoy No. 11, she sighted the Baxter and her tow, which were well below Pomham Light. She blew one whistle, which was immediately answered by one whistle from the Baxter.

"At the exchange of signals the vessels were nearly a mile apart. The Powhatan directed her course to the right of the channel without reducing her speed until near buoy No. 9, when her engines were stopped. She was then less than a quarter of a mile from the place of collision, and at this time it must have been evident to the officers of the Powhatan that the tug and her tow were well over to the westerly side of the channel, and that for the Powhatan to continue her usual course to the right of the channel would involve risk of collision.

"The fault of the Baxter in proceeding with her tow toward Providence up the narrow and crooked channel, well over on the westerly side of the channel, is clearly established by the location of the wreck, which was somewhat eastward of the place of collision. It is clear that she took that side of the channel which lay on her port hand, instead of that side which lay on her starboard hand in direct violation of the following provision of the inland rules:

"'Sec. 25. In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel.' 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]."

"Off Pomham the channel is 700 or 800 feet wide and navigable close up to Pomham Rocks, yet the tow was so near the extreme western edge of the dredged channel as to put the Powhatan in peril of grounding, had she attempted to go much farther to the west.

"The question of the Powhatan's fault is more difficult. When she stopped her engines, just before reaching buoy No. 9, it must have been evident that the tow was so far to the westerly side of the channel that it would require considerable time for the tug to pull her tow over to the easterly side. Capt. Ryan, of the Powhatan, says that, when he got down to buoy No. 9, he hauled to south half east, and that his vessel headed that way up to the time of the collision. He states that she ran on for about a minute; that she then reversed slowly for about a minute, and then backed full speed from two to two and a half minutes, and that then the Allen 'impaled herself' upon the stem of the Powhatan; that he still continued to back, possibly a minute, and released his ship of the obstruction, and then stopped. He testifies that his vessel was under sternway, moving up the river, at the moment of collision.

"Just before the collision the Baxter passed the Powhatan from 50 to 75 feet to the eastward, and Greene, master of the Baxter, testified that he then saw from the water at the Powhatan's stern that she was backing. The evidence as to the speed of the Powhatan at the moment of the collision is very conflicting. Ryan says that his vessel had sternway and was moving up the river; Thorsen, that the Powhatan passed the Baxter at a speed of about seven miles. Upon a consideration of the entire evidence, I am of the opinion that the Powhatan's speed had been very considerably reduced at the moment of collision, and that the question of her fault depends upon whether she did not delay too long in reversing. The evidence preponderates to the effect that the engines were stopped near buoy No. 9, some 1,200 or 1,300 feet from the place of collision, and that she ran on under her headway at least 600 to 700 feet before reversing, and that then she began to back slowly. She was then not more than 500 or 600 feet from the place of collision with the Allen, and not much more than half her ship's length from the Baxter. The Baxter was then on her port bow, and the Allen was nearly ahead and not following the tug, but still swinging, possibly diverted to port by the quick water from the easterly movement of the tug. The situation was then critical, and called for immediate reversal full speed astern.

"It was reasonable to expect that the Baxter would do much more than she did to get to her proper side of the channel, and it is quite probable that the master of the Powhatan did not anticipate such obstinate insistence on the wrong course as that of which the Baxter had been guilty; but, according to Ryan's own statement, he continued backing at slow speed for a full minute before giving the order full speed astern.

"It was probably good judgment to stop rather than to proceed, and the only question of fault which I think is of consequence in relation to the Powhatan is whether she did not unreasonably delay in reversing. That it was quite possible for the Powhatan to have stopped entirely and to have acquired sternway before the collision is apparent from her contention that she did in fact do so. As I find from all the testimony that she was still under a considerable headway, it follows that she did not do what it is claimed on her behalf to have been the proper course."

The result was that the District Court held both the tug and the Powhatan in fault, and no damage accrued to either of them; but the barges which were sunk were held by independent ownership, and the decree of the District Court divided the damage to them between the two steam vessels.

The findings by the District Court were not strictly in accordance with the pleadings, but no point was made on this record on that account. Also, it is not claimed that the navigation was such as to cause any probable danger to the Powhatan by reversing, as the District Court thinks she should have done. Apparently, therefore, she was

not in extremis, in the ordinary sense of the term. Yet it is insisted that Capt. Ryan, her master, was vigilant, and was a very experienced and competent navigator; and there is, on the whole, much to be said in favor of the proposition that the circumstances were such that the marine law excuses the mistake made by him. On the other hand, in the state of the weather as we have explained it, everything was open to Capt. Ryan, and there was ample opportunity for him to act with cool judgment, so that the question is so close that, in view of the numerous expressions of the Supreme Court with reference to the weight to be given to findings of fact of the court of first instance, we would not be justified in reversing the District Court in this particular.

[2] The only other question arising on the record is that of subrogation in behalf of the underwriters on the cargo of the Allen, who paid full insurance thereon. The District Court found that the underwriters were not entitled to subrogation against either the tug or the Powhatan, basing this conclusion upon the proposition that the assured were the owners of the tug, who were also the owners of the Allen; and it evidently yielded to the claim of the tug and the Powhatan that the case is governed by Wager v. Providence Insurance Company, 150 U. S. 99, 14 Sup. Ct. 55, 37 L. Ed. 1013. The view we take is that the case is governed by well settled rules of the law of subrogation, which law rests on broad equities, and is entirely aside from any technicalities. It finds its origin in the Roman law, and, even so far as now recognized by the common law, came through equity, and not from the common law to equity. Judge Story says at section 635 of the first volume of his work on Equity Jurisprudence:

"It is not improbable that this doctrine of marshaling securities or funds, which under another form had its existence in the Roman law, and was therein called subrogation or substitution, was derived into the jurisprudence of equity from that source, as it might well be, since it is a doctrine belonging to an age of enlightened policy, and refined although natural justice."

It follows, therefore, that, applying the doctrine of subrogation, no attention should be paid to technicalities which are not of an insuperable character, but the broad equities should always be sought out, as far as possible. It is also well settled that the same general rules apply to the interpretation and application of policies of marine insurance.

[3] The cargo of the Allen, which was totally lost, belonged to the General Chemical Company, and was fully insured by the Firemen's Fund Insurance Company. The policy having been fully paid, the underwriters assumed to be subrogated to the rights of the Chemical Company against both the tug and the Powhatan. The libel was filed by the General Chemical Company. There is no intervention of record by the underwriters, but the proceeding on the libel was prosecuted by them in their own behalf. Little attention is paid in admiralty to such technicalities when the entire case is fully before the court.

The basis of the conclusion of the District Court on this libel seems to be that the owners of the tug were the insured, and not the Gen-

eral Chemical Company. If such had been the fact, Wager v. Providence Insurance Company might apply. The only point decided there was that, where a bill of lading provides that the carrier should have the benefit of any insurance, this excludes the right of the insurer to subrogation against the carrier, and also that, when the carrier is actually the party insured, the underwriters have no right to recover against him. These are well-settled principles of law, although facts like those which occurred in that case have raised some confusion as to the question whether or not the underwriters are liable to the carrier where the bill of lading contains provisions such as we have stated. We regard it, however, as now settled that, unless the underwriter reserves in its policy a positive right as against such a provision, the underwriter can claim to be subrogated to only such rights as the owner of the cargo or carrier may have, and his right to subrogation is limited accordingly. Hartford Insurance Company v. Chicago Railway Company, 175 U. S. 91, 98, 99, 20 Sup. Ct. 33, 44 L. Ed. 84, only reiterates general propositions on these topics.

In the present case the owners of the tug had an open policy "for the account of whom it may concern" on all lawful goods on board barges owned by them "against any and all risks and perils of fire and inland navigation and transportation, property of the assured or held by them in trust or custody as freighter, forwarder, bailee or common carrier," like policies obtained by commission merchants on goods owned by them and those consigned to them. Such policies may cover not only the special property interest of the assured, but also the general property interest of the bailors, whether shippers or consignors, for the especial relief of the carrier or commission merchant where the loss is through the fault of either, and for the special benefit of the owner of the cargo or of goods consigned where the loss is without fault of the carrier or consignee. Under such a policy, according to the common understanding, both the general owner and the special owner or bailee may be among those "concerned," and are covered thereby.

The policy further provided: "All entries to be made in the passbook prior to any loss to the vessel or cargo." A proper entry was made on the passbook as to the cargo of the Allen, as provided in the open policy, and a certificate issued accordingly for $16,555, "loss if any payable only to the order of the General Chemical Company." The certificate also contained the following:

"It is agreed that upon the payment of any loss or damage the insurers are to be subrogated to all the rights of the assured under their bills of lading or transportation receipts, to the extent of such payments. It is understood and agreed that in case any agreement be made by the assured with any carrier by which such carrier stipulates to have, in case of any loss for which he may be liable, the benefit of this insurance, then and in that event, the insurers shall be discharged of any liability for such loss hereunder."

It was said by the learned judge of the District Court that by this certificate the General Chemical Company was not insured, but was merely the payee in case of loss. Nevertheless, the extract from the certificate which we have given describes it specifically as the assured, and provides that the underwriters should be subrogated to its rights

as such. The extract, in using the word "assured," means, of course, the General Chemical Company, because this is immediately followed by the words "under their bills of lading or transportation receipts," which can have no reference except to the owner of the cargo. Not only does this certificate describe the General Chemical Company as the assured, but the specific facts bring it clearly within the expression "to whom it may concern," and therefore establishes it as the assured. The correspondence in the record between the owners of the tug and the representatives of the owner of the cargo contains a proposition from the former to the latter that the insurance on the cargo might be effected by the owners of the cargo, or by the owners of the tug for the account of the former, the premium to be additional to the freight named in the letter. As the owners of the tug paid the premium, and the premium was added to the freight and paid by the owners of the cargo, this establishes beyond question that the policy was intended to protect the owners of the cargo, and brought them within the description of "whom it may concern." This was necessary, because, while the owners of the cargo might be protected to a certain extent against the negligence of the owners of the tug, there were marine risks for which the owners of the tug were not liable, and against which the former also needed protection.

It is true that the two papers—that is to say, the policy and the certificate—are to be taken as one instrument for the present purposes, to the same effect as if the certificate had been indorsed on the policy. Under those circumstances, the owners of the tug might still be also insured, as the holders of the policy. The breadth of meaning to be given to the words "to whom it may concern" is clearly illustrated in Hooper v. Robinson, 98 U. S. 528, 25 L. Ed. 219, and in Hagan v. Insurance Company, 186 U. S. 423, 22 Sup. Ct. 862, 46 L. Ed. 1229. It is fully stated in Phillips on Insurance (5th Ed.) § 383 and sequence. We refer especially to sections 384 and 385, as follows:

"Sec. 384. The intention of party who orders the policy determines who are the 'concerned' under a general description; though those intended are not known by the broker who effects the policy, or by the insurers, to be so.

"Sec. 385. The rule, that an insurance 'for whom it may concern' will avail in behalf of the party for whom it is intended, does not mean that any specific individual must be intended. It is enough that the agent, and the insurers, intend it for any party or parties who have an insurable interest. If the insurance is ordered, then its application is governed by the intention of the party who originally gives the order; if it is not ordered, its application will be to the interest of the party intended by the one effecting it, whether himself or another. But he may intend it for whatever party shall prove to have an insurable interest in the specified subject, in which case it will be applicable to the interest of any person subsequently ascertained to have such an insurable interest, who adopts the insurance.

"A valid insurance may, therefore, be made between parties, both of whom are at the time ignorant of the specific persons to whose interest it is applicable."

The question in our minds is not whether the General Chemical Company was insured, but whether the owners of the tug were likewise insured for present purposes. The necessity of insurance was, of course, a mixed question. The owners of the cargo especially

needed it with reference to the perils of the sea, and other perils for which the owners of the tug were relieved either by the law or by the bill of lading, while the owners of the tug needed it for protection against loss arising from their own negligence. Bearing in mind that the owners of the tug held the open policy, while the owners of the cargo were protected only by the certificate accompanying the same, and that the insurance was effected through the hand of the owners of the tug, it might not be absurd to suppose that the owners of the tug intended to protect themselves against claims of the class involved here; but, under the circumstances, it is plain that they did not so protect themselves. They paid no premium out of their own pockets, and they are not entitled to claim the benefit of insurance for which they did not pay or agree to pay. It is said that they had a separate policy covering the ordinary towage risks. If they had, the question here, so far as the tug is concerned, would probably come down ultimately to one between the underwriters on the open policy and the policy covering the towage risks, and not between the underwriters under the open policy and the tug. This, however, is a matter with which we have no occasion to concern ourselves. The Firemen's Fund Insurance Company has full right of subrogation against the tug and against the Powhatan, neither of which were insured so far as the Firemen's Fund Insurance Company is concerned, a right which in this case was clearly protected by the certificate from which we have fully quoted.

The rules which we have stated as to subrogation are so well settled that we need not cite authorities therefor; but it will be interesting for any one to examine in this connection 4 Joyce on Insurance (Ed. of 1897) § 35 and sequence, 1 Arnold's Marine Insurance (8th Eng. Ed.) § 1225 and sequence, and Tyser's Loss under Policies of Marine Insurance (1894) § 269 and sequence.

[4] Therefore the only question remaining on this branch of these appeals is whether the Firemen's Fund Insurance Company shall have a decree for the full amount against the Powhatan. Representing an innocent party, it is entitled to hold both the Powhatan and the tug until its loss is made good. As, however, there is no suggestion that the tug is not pecuniarily responsible, under the circumstances, to make good its one-half of the loss of the Firemen's Fund Insurance Company, the decree, so far as these underwriters are concerned, will be substantially the same as that directed in The Virginia Ehrman, 97 U. S. 309, 317, 24 L. Ed. 890, and in The Sterling, 106 U. S. 647, 1 Sup. Ct. 89, 27 L. Ed. 98.

The result of it all is to affirm the decisions of the District Court with reference to the Powhatan except so far as concerns the right of the Firemen's Fund Insurance Company, and also to affirm the decree of the District Court in favor of those interested in the barge Elhcurah and her cargo, and to reverse its decree on the libel of the General Chemical Company, and enter a new decree therein in favor of the Firemen's Fund Insurance Company as stated in this opinion.

The judgments will be as follows:

In No. 920, the case of the litigation between the Powhatan and the owners of the tug, the decree of the District Court dividing the dam-

ages suffered by the barge Ira A. Allen is affirmed with interest, with costs of appeal awarded to the appellees.

In No. 921, the litigation in behalf of the General Chemical Company, representing the Firemen's Fund Insurance Company, the decree of the District Court is reversed, with directions to enter a new decree in accordance with the opinion passed down the 29th day of November, 1911; and the appellant recovers its costs of appeal, and also its costs in the District Court.

In No. 922, the litigation between the owners of the tug and of the Powhatan on the one side, and the representatives of the barge Elheurah and its cargo on the other side, the decree of the District Court is affirmed with interest, with leave to the District Court to modify, if necessary, the decree as provided with reference to the decree in No. 921; and the appellees recover their costs of appeal.