508 F.2d 1381
 ATLAS ASSURANCE COMPANY, LTD., Plaintiff-Appellant,
v.
HARPER, ROBINSON SHIPPING CO. et al., Defendants, Portland
Stevedoring Company; Schulte & Bruns and Sterling
International; Third-Party-Defendants, Sterling
International, Third-Party-Defendant-Appellee.
 No. 72-3141.
 United States Court of Appeals, Ninth Circuit.
 Jan. 7, 1975.
 
 Martin P. Detels, Jr., of Detels, Draper & Marinkovich, Seattle, Wash., for plaintiff-appellant.
 George W. McBroom of Shidler, McBroom, Gates & Baldwin, Seattle, Wash., for third-party-defendant-appellee.
 Before: TRASK and SNEED, Circuit Judges, and JAMESON,* District judge.
 OPINION
 SNEED, Circuit Judge:
 
 
 1
 This case presents two interesting questions concerning marine cargo insurance. First, whether a shipper of goods who procures cargo insurance remains an Assured following his transfer of a certificate of insurance with the bill of lading to the consignees of the cargo pursuant to a CIF sale.[1] Second, whether the insurer may be subrogated to the claims of the consignees against the carrier when the cargo damage was caused by stevedores and the cargo was shipped on an FIO basis[2] by the shipper who had procured the insurance. The case was tried on stipulated facts which may be summarized as follows.
 
 
 2
 The principal parties are plaintiff-appellant Atlas Assurance Company, Ltd., a British insurance company; third party defendant-appellee Sterling International, the shipper; and defendant Cargill, Inc., the carrier.
 
 
 3
 On March 19, 1968, Cargill time-chartered the M/S Ilse Schulte from its owner Schulte and Bruns. On March 20, 1968, Cargill as disponent owner (time charterer) sub-chartered the vessel (space charter) to Sterling International as shipper, on an FIO ('Free In and Out') basis.
 
 
 4
 On April 4, 1968, Sterling delivered to the vessel at Longview, Washington, a cargo of Kraft linerboard for carriage to Rotterdam and Hamburg. Bills of lading were issued in identical form by agents for the master to Sterling; the bills were negotiable, order bills.
 
 
 5
 Plaintiff Atlas Assurance Company, Ltd. insured the cargo under its Marine Open Policy No. 658; the policy insured 'Sterling International, for the account of whom it may concern, loss, if any, payable to the Assured or order.'
 
 
 6
 The goods insured included 'Kraft Paper' and extended to the perils 'of the sea, fire, rovers, assailing thieves' etc. and 'all other like perils, losses and misfortunes, that have or shall come to the hurt, detriment or damage of the aforesaid subject matter of this insurance or any part thereof.' The policy contained no provision for liability coverage to Sterling and there is nothing in the record to show that Atlas had notice of Sterling's FIO contract with Cargill.
 
 
 7
 Certificates of insurance in identical form were executed under this policy for each bill of lading. The insurance certificates similarly insured Sterling 'to be insured, for account of whom it may concern' and extended 'Against all risks of physical loss or damage . . .' but did not provide Sterling with any liability coverage.
 
 
 8
 Thereafter, the Ilse Schulte sailed from Longview and arrived at Rotterdam and Hamburg, there discharging the cargo of Kraft linerboard. Following discharge damage to the cargo was noted by surveyors representing cargo's interests and attributed by them to improper handling by the loading and/or discharging stevedores.
 
 
 9
 While the vessel was in transit, Sterling negotiated the bills of lading, and insurance certificates on a CIF basis though normal commercial channels for payment against letters of credit held by collecting banks. The letters of credit were honored by consignees' banks and the documents (order bills and insurance certificates) released to the consignees. The insurance certificates provided that loss was paysble on surrender of the policies 'and, on the payment being made, liability under this insurance shall thereby be discharged.' The consignees presented the bills of lading and the cargo was delivered to them at the ports of discharge.
 
 
 10
 Upon receipt of the goods the consignees made claims against Atlas on the insurance certificates for the cargo damage. Atlas paid the consignees and received a written subrogation assignment from each consignee in identical form. The consignees delivered to Atlas the original bills of lading and the insurance certificates upon payment by Atlas of the consignees' claims.
 
 
 11
 Thereafter Atlas commenced suit as subrogee of the consignees against Cargill as time charterer and Schulte and Bruns as shipowner for the cargo damage. Cargill and Schulte and Bruns impleaded Portland Stevedoring Co. for causing the damage and Cargill later impleaded Sterling to recover indemnity based upon its FIO contract for any liability for cargo damage. Sterling thereupon filed a cross claim against Atlas for indemnity contending that Atlas had insured Sterling for any damages sustained.
 
 
 12
 Following discovery and the entry of an order denying Cargill's motion for summary judgment against Atlas, the parties entered into a stipulation for judgment by the terms of which Atlas was to recover judgment as subrogee of the consignees from Cargill for cargo damage for Cargill's obligations under its bill of lading; the judgment was to be in the amount of $5,500 with interest to commence on February 15, 1972. Cargill was to recover indemnity from Sterling (without attorney's fees) based upon the contract between Cargill and Sterling, specifically the FIO provision, and the issues between Atlas and Sterling were reserved. The stipulation provided for dismissal with prejudice of Portland Stevedoring and Schulte and Bruns upon their contribution of $500 and $250 respectively, that Sterling could 'contest the relevancy of the 'FIO' provision,' and that Sterling and Atlas were to stipulate as to the facts on issues between them. On July 7, 1972, judgment on consent was entered on this stipulation.
 
 
 13
 Sterling and Atlas entered into further stipulations of fact and then argued the issues between them concerning Sterling's claim for indemnity from Atlas. Judgment was entered by the District Court vacating the judgment on consent and dismissing the complaint of Atlas. The judgment of October 2, 1972, states in pertinent part:
 
 
 14
 The doctrine of subrogation should not be applied herein in favor of Atlas against Cargill and if so applied, should result in judgment over in favor of Sterling against Atlas for any sums recovered by Cargill from Sterling.
 
 
 15
 It is from this judgment that this appeal is taken.
 
 
 16
 The basic question then is who must seek recovery against the stevedores because, as stipulated, the negligence was theirs. Atlas, having paid the claim of the consignees, prefers to sue Cargill. Cargill would then be indemnified by Sterling on the FIO agreement, leaving the burden of suing the stevedores on Sterling if Atlas is correct in its contention that it is free from liability derived from the FIO agreement. Sterling's position is that a suit against Cargill is really a suit against Sterling and that Sterling, as an Assured party, cannot be sued by Atlas. This would force Atlas to seek recovery against the stevedores.
 
 
 17
 Based on our understanding of the terms and purposes of the policy of insurance here in question we decline to grant the equity of subrogation to Atlas and permit suit against Cargill. Such a suit is effectively a suit against Sterling whom we find to be an Assured party. We therefore affirm the judgment below.
 
 Assured Parties
 
 18
 We can not accept the contention of Atlas that Sterling is not an Assured under the policy. Sterling is the only named Assured:
 
 
 19
 ASSURED 1. The ATLAS ASSURANCE COMPANY, LIMITED, in consideration of premium at the rate or rates hereinafter stated, does insure
 
 STERLING INTERNATIONAL
 
 20
 2. For account of whom it may concern.
 
 
 21
 3. Loss, if any, payable to the Assured or order.
 
 
 22
 4. Upon lawful goods and merchandise of every kind and description consisting principally of Kraft Paper . . .
 
 
 23
 The phrase 'for account of whom it may concern' does not alter the status of Sterling as an Assured. The Supreme Court has thoroughly discussed the broad coverage which use of this phrase imparts:
 
 
 24
 We concur in the view that by virtue of the language contained in the policy, 'on account of whom it may concern,' it is not necessary that the person who takes out such a policy should have at that time any specific individual in mind. If he intended the policy should cover the interest of any person to whom he might sell the entire or any part of the interest insured, that would be enough. In Hooper v. Robinson, 98 U.S. 528, 25 L.Ed. 219, it was said that a policy upon a cargo in the name of A, on account of whom it may concern, will inure to the interest of the party for whom it was intended by A, provided he at the time of effecting the insurance had the requisite authority from such party or the latter subsequently adopted it. The facts in that case differ materially from those presented by this record, but the meaning of the language 'on account of whom it may concern' is stated in the opinion of the court, and authorities are therein cited which show that it is not necessary that at the time of effecting the insurance the person taking it out should intend it for the benefit of some then known and particular individual, but that it would cover the case of one having an insurable interest at the time of the happening of the loss, and who was intended to be protected at the time the party took out the insurance.
 
 In 1 Phillips, Insurance, it is stated:
 
 25
 Sec. 385. The rule, that an insurance 'for whom it may concern' will avail in behalf of the party for ahom it is intended, does not mean that any specific individual must be intended . . .. But he may intend it for whatever party shall prove to have an insurable interest in the specified subject, in which case it will be applicable to the interest of any person subsequently ascertained to have such an insurable interest, who adopts the insurance.
 
 
 26
 Sec. 388. One may become a party to the insurance effected in his behalf, in terms applicable to his interest, without any previous authority from him, by adopting it, either before or after a loss has taken place and is known to him, though the loss may have happened before the insuurance was made.
 
 
 27
 In 2 Duer, Marine Insurance, p. 28, it is stated as follows:
 
 
 28
 In England, the policy in its usual and almost invariable form contains a general clause, the terms of which are sufficiently comprehensive to embrace all persons who have an insurable interest in the property, and a lawful right to be insured. The insurance is expressed to be 'in the name of A. B. (the person effecting the policy), as well in his own name as for and in the name and names (without specification) of all and every other person and persons to whom the same (the property insured) doth, may, or shall appertain, in part or in all.' In the United States, as on the continent of Europe, the general clause is framed in various forms of expression, and the construction necessarily varies, as the terms used are more or less extensive in their application. In some cases the insurance is expressed to be 'on account of the owners.' In some, on 'account of a person or persons, to be thereafter named;' but its most usual form is, 'on account of whom it may concern.' An insurance on account of the 'owners,' is probably limited to those who have a legal interest in the subject insured. But the words, 'on account of whom it may concern,' are coextensive in their possible application with the general clause of the London policy.
 
 
 29
 Hagan v. Scottish Union & Nat'l Ins. Co., 186 U.S. 423, 429-431, 22 S.Ct. 862, 46 L.Ed. 1229 (1902).
 
 
 30
 There is nothing in the record which would suggest that Sterling did not intend to protect itself as well as other parties that might come to have an interest in the goods. Atlas has never contended that Sterling did not have an insurable interest. Nor does it appear that it could make such a claim for 'any person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss, whether he has or has not any title in, or lien upon, or possession of the property itself.' Harrison v. Fortlage, 161 U.S. 57, 65, 16 S.Ct. 488, 490, 40 L.Ed. 616 (1896). See Groban v. S.S. Pegu, 331 F.Supp. 883, 894 (S.D.N.Y., 1971), aff'd, 456 F.2d 685 (2d Cir., 1972). Sterling had an interest in insuring against the possibility that the consignee, as here, would accept the goods and sue for damages by reason of an injury arising during loading or unloading. It also ran the risk that the purchaser would rightfully reject the goods by reason of an injury arising prior to loading. See II Arnould, Marine Insurance, 171 n. 13; Cf. The Astri, 151 F.2d 5, 1945 A.M.C. 1064, 1070 (2d Cir.). Furthermore, it is stipulated that Sterling did not negotiate the bills of lading until the vessel was in transit and we note that the cargo damage might have occurred during the loading of the vessel. We can not believe that Sterling did not intend to protect these interests when it purchased the policy of insurance.
 
 
 31
 The certificate of insurance which accompanied the bill of lading in the CIF sale did not change the status of Sterling as an Assured. A certificate of insurance is not a substitution of parties. It 'is not, and does not purport to be, a policy, but states that a policy covering the goods is in existence, and gives details of the vessel, voyage, subject-matter and refers to the terms and conditions of the underlying policy.' I arnould, Marine Insurance, 138. The underlying policy here was issued to Sterling as Assured. But, even if the certificate were regarded as a separate policy, it repeats the words of the Open Policy, naming Sterling as the Assured 'for account of whom it may concern . . . Loss, if any, payable to the Assured or order.'[3]
 
 
 32
 Wager v. Providence Ins. Co., 150 U.S. 99, 14 S.Ct. 55, 37 L.Ed. 1013 (1893) is similar to the present case and supports our finding that Sterling is an Assured. In Wager an owner of grain (Armour) engaged a carrier (Morse) who contracted with a shipowner (Wager). Morse obtained a policy of insurance and, pursuant to the policy, a certificate of insurance covering the grain was issued to Morse, 'loss (if any) payable to assured or order.' Morse endorsed the certificate in blank, attached it to the bill of lading for the grain, and delivered it to the agent of Armour. The cargo was damaged when the vessel ran aground. The insurer paid Armour and attempted to bring suit against Morse and Wager as subrogee of Armour's claim. The Supreme Court denied subrogation of the claim against Morse, finding that Morse was an Assured;
 
 
 33
 The facts in the present case were that the open policy declared that it was issued on account of H. Morse & Co. for whom it may concern, and that it insured the several persons, whose names should be thereafter indorsed thereon as owner, advancee, or common carrier on goods, wares, merchandise, or country produce, on his own boat, or boats belonging to others, loaded on commission or chartered.
 
 
 34
 Under this open policy Morse & Co. applied to the insurance companies, stating that insurance was wanted by H. Morse & Co., on wheat valued at $9875, from Buffalo to New York. Loss, if any, to be payable to Morse & Co., or order. Upon this application, the insurance companies issued what is termed an insurance certificate to H. Morse & Co., setting forth that, subject to the conditions of policy No. 772, H. Morse & Co., insured, in the sum of $9875, the inboard cargo of boat 'William Worden;' the loss, if any, to be payable to assured or order, and return of this certificate. The premium was paid by H. Morse & Co.
 
 
 35
 Clearly, under this state of facts, H. Morse & Co. were, nominally at least, the parties insured, and came within the terms of the policy, and, upon a loss, were entitled to receive the amount of the policy, and, of course in that event, the insurers could not, after having paid H. Morse & Co. the amount of the loss, recover it back from them under the principle of equitable subrogation. The question then arises whether a different conclusion should be reached because of the fact that H. Morse & Co., when they delivered the bill of lading to Meadows as agent for Armour, Plankinton & Co., attached thereto the insurance certificate indorsed by them in blank.
 
 
 36
 So far as the insurance companies were concerned, H. Morse & Co. were under no obligation to transfer the policy to Armour, Plankinton & Co., nor to make it payable to them in case of loss. That was a matter entirely between H. Morse & Co., as carriers, and Armour, Plankington & Co., as consignees and owners of the cargo.
 
 
 37
 When, subsequently, the insurance companies paid to Armour, Plankinton & Co. the amount of the loss, they did so, not by virtue of any contract between themselves and the consignees, but of the contract between themselves and H. Morse & Co., whereby they had agreed to pay the loss to the latter or order.
 
 
 38
 We think, therefore, that the circuit court was right in dismissing the libel against H. Morse & Co., and its decree to that effect should be affirmed.
 
 
 39
 Merchants' & Miners' Transp. Co. v. Robinson-Baxter-Dissosway Towing and Transp. Co., 191 F. 769 (1st Cir., 1911), cert. denied 225 U.S. 704, 32 S.Ct. 837, 56 L.Ed. 1265 (1912), is the only other case which we have found that bears a significant similarity to the one before us. There a towing company procured an open marine policy 'for the account of whom it may concern' covering the lawful goods on barges operated by the towing company. Pursuant to the policy, the company procured a certificate of insurance on the cargo of one barge, 'loss if any payable only to the order of' the owner of such cargo. The towing company paid the premium on the certificate and added it to the cost of the freight under an agreement with the cargo owners. While in tow the barge was sunk in a collision, The court permitted the cargo owners to sue the towing company on behalf of the insurer which was subrogated to the cargo owner's claims.
 
 
 40
 Although Merchants' & Miners' Transp. Co., allows subrogation, it is not necessarily in conflict with our decision. The certificate of insurance before the court there provided, 'loss if any payable only to the order of the General Chemical Company (the cargo owners).' 191 F. at 773. It might therefore be reasonable to conclude that the parties intended that the cargo owners would be the only assured and that the towing company was not an assured. We can not, however, agree with part of the reasoning used by the court in reaching that result:
 
 
 41
 Bearing in mind that the owners of the tug held the open policy, while the owners of the cargo were protected only by the certificate accompanying the same, and that the insurance was effected through the hand of the owners of the tug, it might not be absurd to suppose that the owners of the tug intended to protect themselves against claims of the class involved here; but, under the circumstances, it is plain that they did not so protect themselves. They paid no premium out of their own pockets, and they are not entitled to claim the benefit of insurance for which they did not pay or agree to pay.
 
 
 42
 191 F. at 775.
 
 
 43
 We cannot give such great weight to the question of which party ultimately bears the cost of insurance. Sterling had an insurable interest to protect and there is nothing in the policy or certificate procured by it which would indicate an intention not to protect this interest. The fact that Sterling successfully passed the cost of insurance on in a CIF sale reflects commercial practice rather than an intention to lose the protection of insurance. As stated in an analogous case where the carrier was the named Assured:
 
 
 44
 Nor does the fact that the cost of insurance was included in the carrier's rate affect the question. The rate would properly cover all the reasonable expenses incident to the transportation, and when the carrier assumed liability to the cargo owners for damages and losses caused by marine perils, there was nothing unreasonable in the carrier's protecting itself against the risk by procuring insurance and covering the cost in its rate.
 
 
 45
 Great Lakes Transit Corp. v. Interstate Steamship Co., 301 U.S. 646, 653, 57 S.Ct. 915, 81 L.Ed. 1318 (1937).
 
 Subrogation
 
 46
 Atlas further argues that, even if Sterling is the Assured, Atlas is asserting its claim against Cargill and not against Sterling. We cannot blind ourselves to the fact that a suit against Cargill is effectively a suit against Sterling. The parties have stipulated that Cargill will be indemnified by Sterling due to the FIO agreement if Cargill is found liable to Atlas through the subrogated claims of the consignees. Atlas is clearly attempting to sue its Assured, albeit in a circuitous manner, and the equity of subrogation will be denied to Atlas under the familiar doctrine that subrogation does not invest the underwriter with a right to override its obligation to its Assured. Great Lakes Transit Corp., supra, 654, 57 S.Ct. 915, 81 L.Ed. 1318; Phoenix Ins. Co. v. Erie Trans. Co., 117 U.S. 312, 6 S.Ct. 772, 29 L.Ed. 923 (1886).
 
 
 47
 We do not accept the argument that the equities nevertheless favor subrogation because Sterling has acted to prejudice the claims against Cargill by shipping the cargo FIO. While equity does give recognition to the effect of prejudicial acts, this doctrine has principally developed in cases where the assured has acted to diminish a matured claim against third parties by release or laches. See West of England Fire Ins. Co. v. Issacs, 2 Q.B. 377 (1896), aff'd, 1 Q.B. 226 (C.A.1897); II Arnould, Marine Insurance, 1208; Annotations, 80 L.Ed. 374, 38 A.L.R.2d 1095.
 
 
 48
 The equitable doctrine of subrogation passes to the insurer only those rights which the assured has and, if the rights of the assured have been limited by lawful contract, the rights of the insurer are likewise limited. Phoenix Ins. Co., supra. The assured can not, however, act to materially alter the risk to the insurer or procure the policy by fraudulent concealment or misrepresentation. See Phoenix Ins. Co., supra; Tate and Sons v. Hyslop, 15 Q.B.D. 368 (1885).
 
 
 49
 The shipment of the cargo FIO did not materially alter the risk assumed by Atlas under the policy. The FIO agreement was not a contract of indemnity and did not relieve Cargill of responsibility for its own acts. It did no more than place the costs and responsibility for loading and discharging on Sterling, the shipper. Although the consequence of this is to deprive Atlas of the COGSA bill of lading presumptions against Cargill this is only to say that Cargill is not liable for what it has not done, viz., the stevedoring. See Carriage of Goods by Sea Act, 46 U.S.C.A. 1300 et seq.
 
 
 50
 Atlas can not complain of prejudice since it insured Sterling from 'warehouse to warehouse'[4] and against 'all perils.' In none of the exclusions to this broad policy coverage is the Assured prohibited from undertaking the stevedoring responsibility pursuant to FIO terms. Ambiguities are to be resolved against the insurer. Great Lakes Transit Corp., supra, 653, 57 S.Ct. 915, 81 L.Ed. 1318. Nor can Atlas complain of unfair surprise at the common and commercially acceptable practice of FIO shipments. Atlas assumed the risk that the goods would be shipped FIO and that the stevedoring would be done by the servants of its Assured. No provision of its policy even faintly suggests otherwise. It cannot invoke the equity of subrogation to avoid this obligation to Sterling. To permit it to do so would require the shipper of goods to acquire additional coverage from the insurer when an FIO contract with the carrier was contemplated notwithstanding the fact that the initial contract of insurance appears to protect all, including the shipper, 'warehouse to warehouse'. We believe that the exclusion of the shipper from a portion of this coverage because of a commercially reasonable FIO contract must be achieved through the language of the policy and not through subrogation. The judgment is therefore
 
 
 51
 Affirmed.
 
 TRASK, Circuit Judge (dissenting):
 
 52
 I respectfully disagree with the majority. The basic position of the trial court was that subrogation may not be allowed the insurer where to permit it would result ultimately in a judgment over against the shipper who was the original named insured in the policy. Thus, the theory goes, that the case falls within the principle that an insurer may not recover its loss from its own insured. The majority accepts this as the rationale of its position. It holds:
 
 
 53
 '. . . we decline to grant the equity of subrogation to Atlas and permit suit against Cargill. Such a suit is effectively a suit against Sterling whom we find to be an Assured party.'
 
 
 54
 First of all, Atlas, the insurer, is not exercising its right of subrogation to assert an action against Sterling, the original shipper and the named insured of Atlas, either 'effectively' or any other way. The policy was purchased by Sterling, 'for the account of whom it may concern: loss, if any, payable to the Assured or order.' It insured goods shipped by sea under specific bills of lading with a certificate of insurance covering the goods under each of a number of bills of lading, each certificate executed pursuant to the original policy. The goods represented by this documentation were sold to various consignees on a regular CIF basis. When the goods arrived in a damaged condition the purchasers had a cause of action against those who caused the damage. (It was agreed that the damage was caused by stevedores in the course of loading and unloading). But they were not required to pursue this course. They called upon Atlas as their insurer to pay for the damage. Atlas did and became subrogated to the position of the consignees under their bill of lading. Luckenbach v. McCahan Sugar Co., 248 U.S. 139, 149, 39 S.Ct. 53, 63 L.Ed. 170 (1918). As such subrogee it could probably have sued the stevedores directly. It chose to sue the carrier, Cargill, under the Carriage of Goods by Sea Act, 46 U.S.C. 1300 et seq.
 
 
 55
 This it was clearly entitled to do. Fabbri Co. v. Universal Shipping Corp., 310 F.Supp. 964 (S.D.N.Y.1969). At this point, Atlas, as insurer standing in the shoes of its consignees, should have been accorded the right to a judgment against Cargill, the carrier. It is at this point, however, that the logic of the trial court and the majority becomes derailed. They assert that subrogation cannot be permitted because Cargill in turn seeks third party indemnification against Sterling, the shipper, for payment of the amount Atlas has recovered. This, contends the majority, would be full-circle recovery by Atlas, the insurer, against Sterling, its original insured.
 
 
 56
 The fallacy is that the indemnification sought by Cargill, carrier, against Sterling, the shipper, does not arise out of any subrogation rights of Atlas on payment of consignees. Cargill is entitled to indemnification against Sterling, if at all, because Sterling in an entirely separate contract (the FIO provision) had agreed to pay any damage which Cargill might be liable for resulting from loading and unloading by the stevedores. Atlas, the insurer, was not a party to this agreement and knew nothing about it; neither did the consignees. Thus, the majority in their statement that '. . . we decline to grant the equity of subrogation to Atlas and permit suit against Cargill. Such a suit is effectively a suit against Sterling whom we find to be an Assured party', is incorrect. The only action available against Sterling is one by Cargill not Atlas. The cause of action is not based upon subrogation, it is based upon the FIO contract entirely between Sterling and Cargill. Then in a final Parthian shot at the by now completely bewildered Atlas, the majority blithely says: 'Nor can Atlas complain of unfair surprise at the common and commercially acceptable practice of FIO shipments. Atlas assumed the risk that the goods would be shipped FIO and that the stevedoring would be done by servants of the Assured.' No authorities are cited.[1]
 
 
 57
 The other facet of the case with which I cannot agree with my Brethren is that which holds that Sterling, after it had sold the cargo to the consignees remained an Assured party so that the subrogation rights of Atlas should be denied lest the insurer be suing its own insured. Heavy reliance is placed upon Hagan v. Scottish Union & National Insurance Co., 186 U.S. 423, 429-431, 22 S.Ct. 862, 46 L.Ed. 1229 (1902), which is quoted from at length. That was a situation where the Court examined the legal significance of the phrase 'for account of whom it may concern' in a policy of marine insurance covering a tugboat. It concluded that the reach of the phrase clearly extended beyond the then owner to 'whatever party shall prove to have an insurable interest in the specified subject' (quoting from 1 Phillips Insurance, section 385). In Hagan v. Scottish Union & National Insurance Co., supra, the named insured had sold a half interest in the tugboat to one Martin who held that interest at the time of the loss. That case would have been apposite had Atlas refused to pay the consignees who had purchased the bills of lading and thus the cargo. There was no question raised about such coverage. age. Atlas did pay those consignees. The majority also relies upon a very broad generalization defining the term 'insurable interest' as stated by the District Court in Groban v. S.S. Pegu, 331 F.Supp. 883, 894 (S.D.N.Y.1971). That case relies in turn upon Hagan, supra, and is similar on the facts. The named insured and consignor had bought the tractor parts and had resold them to one of the plaintiffs. The principle to be applied as stated by the court was:
 
 
 58
 'If an assured has a contract under which the title of a cargo would accrue to him upon delivery and he would suffer from loss of the goods prior to the delivery, an insurable interest exists, . . .' Groban v. S.S. Pegu at 894.
 
 
 59
 At the time of the loss here, Sterling, the shipper, had no interest in the goods either present or prospective and liability is not asserted by Cargill based upon the contract of insurance either directly or indirectly but upon the FIO contract to which Atlas was a stranger. Nor is there the slightest evidence in the record that Atlas intended to provide insurance for this unrelated risk.
 
 
 60
 I would reverse and direct that the judgment entered upon stipulation of the parties be reinstated.
 
 
 
 *
 Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation
 
 
 [1]
 Under C.I.F. terms in the contract of sale and purchase of goods carried by sea, the deal is consummated not by the delivery of possession of goods, but by the delivery of a bundle of documents, of which three are the essential basis. First, the seller's invoice, (or bill of sale), which describes the goods as to quality, quantity, date and place of shipment, and other commercial facts and representations and warranties, this being called the COST and represented by the letter C. Next the insurance policy, relating to the marine risk by transport by sea, and sometimes also on land for getting to the ship and on land for leaving the ship, which is called the 'warehouse to warehouse coverage,' this being called the INSURANCE and represented by the letter I. Thirdly, the bill of lading which as a receipt recites that the goods have been tallied into the ship, and by its date shows when that happened, and which is a contract of carriage and shows that the freight is a certain agreed sum, and how it is to be paid, and that the goods will be carried from the named port of loading to the named port of destination, with the names of the shipper and the consignee or 'order notify' party, this being called FREIGHT, and represented by the letter F
 Knauth, Ocean Bills of Lading (1953). Although Knauth speaks of an insurance 'policy,' the commercial practice is to provide a certificate of insurance which evidences the underlying policy. I Arnould, Marine Insurance, 138.
 
 
 [2]
 The International Maritime Dictionary, p. 281, defines 'FIO' (Free In and Out) as a term by which the owner who charters the ship is responsible for all the costs of ship management with the exception of loading and discharging cargo. This definition would place the responsibility for loading and discharging cargo on the shipper. St. Ioannis Shipping Corp. v. Zidell Explorations, Inc., 222 F.Supp. 299, 305 (D.Ore.1963), aff'd, 336 F.2d 194 (9th Cir., 1964)
 
 
 [3]
 Section 38 of the policy discusses certificates of insurance:
 
 
 [38]
 In order that the Assured may be able to furnish without delay evidence of the fact that insurance has been effected upon shipments covered by this Open Policy, this Company will deliver to the Assured in the state where this Policy is issued and countersigned special policies and/or certificates issued subject to and in accordance with the terms and conditions of this Policy and such other terms and conditions as may be agreed upon between the Assured and this Company; and provided copies of such special policies and/or certificates of insurance are mailed to this Company as soon as practicable, the Assured by endorsement thereon may assign and transfer such special policies and/or certificates of insurance covering any shipment insured hereunder, which assignment or transfer shall convey all the rights of the Assured provided in and by this Open policy to collect from this Company for any loss, damage or claim with respect to shipments therein described. The assignment and transfer of such special policies and/or certificates are actually done by the Assured for his own benefit and shall not constitute the Assured an agent of this Company for the effecting or procuring of insurance or otherwise
 This section indicates that, at the most, the certificates constituted an assignment of the Assured's (Sterling's) 'rights . . . to collect . . . for any loss, damage or claim.' Section 38 does not, however, indicate in any way that the certificates caused a change in the status of Sterling as an Assured. In fact it indicates the contrary by referring to the certificates as 'evidence' of the policy between Atlas and Sterling.
 
 
 [4]
 Paragraph 13 of the policy provides:
 This insurance attaches from the time the goods leave the warehouse and/or Store at the place named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transhipment if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be arranged in the event of transhipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the Assured.
 
 
 [1]
 One cannot help but wonder how an insurer of goods under a CIF contract would calculate its risk and fix its premium under such an 'assumption.'