JUSTICE McKINNON,
dissenting.
¶75 I dissent from the decision of the Court holding that the Lincoln County Port Authority (Port) was an insured party under the terms of the Allianz policy. The plain, unambiguous language of the Allianz policy does not include the Port as an insured party. Nevertheless, the Court concludes that the policy is ambiguous and moves on to an analysis of the extrinsic evidence. In so doing, the Court mischaracterizes the relationship between the Montana Association of Counties (MACo) and the Port. The result reached by the Court disregards the general intent of the contract and is supported by neither the facts nor the law.
¶76 When this Court is asked to interpret a written contract, “the *78 intention of the parties is to be ascertained from the writing alone if possible ....” Section 28-3-303, MCA. As the Court observes, the plain language of the Allianz policy identifies the insured as MACo “and its subsidiary, associated or allied company, corporation, firm, [or] organization.” Opinion, ¶ 16. The use of the singular form of “subsidiary, associated or allied company, corporation, firm, [or] organization” indicates that the parties contemplated only one such associated or allied entity, specifically, Montana Association of Counties Joint Powers Insurance Authority (MACo/JPIA). Opinion, ¶ 16. The plain language definition of “insured” in the Allianz policy clearly indicates that the parties did not intend each of the counties and special districts insured by MACo/JPIA to be named as insured in the Allianz policy.
¶77 Had the parties intended for each county or public entity to be insured directly by Allianz, the policy itself provided a clear way of expressing this intent. The policy includes separate designations for “Insured” and “First Named Insured” parties. The “First Named Insured” bears responsibility for payment of premiums and is authorized to cancel the policy. The parties could, therefore, have listed the Port and other entities insured by MACo/JPIA as the “Insured” on the Allianz policy and designated MACo as the “First Named Insured” responsible for management of the policy. The parties did not do so, and instead chose to designate MACo as both the “Insured” and the “First Named Insured.” The contract, on its face, evidences the parties’ intent to name only MACo and its single associated entity, MACo/JPIA, as the insured.
¶78 The Court concludes that the policy’s definition of insured personal property is ambiguous, and therefore proceeds to consider extrinsic evidence of the parties’ intent. Opinion, ¶¶ 20-21. This Court has not been asked to construe the policy as applied to personal property, however, and the Court disregards completely the definition of insured real property. The policy’s definition ofinsured real property is unambiguous and fully consistent with the designation of MACo and MACo/JPIA as the named insured. The Allianz policy states that the insured property includes “[r]eal property in which the Insured has an insurable interest.” An insurable interest in property is “any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment.” Section 33-15-205(2), MCA. An insurable interest need not be an ownership or possessory interest. Rather, “any *79 person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss ... .” Harrison v. Fortlage, 161 U.S. 57, 65, 16 S. Ct. 488, 490 (1896), Atlas Assurance Co. v. Harper, Robinson Ship. Co., 508 F.2d 1381, 1386, (9th Cir. 1975); Bird v. Central Mfrs. Mut. Ins. Co., 168 Ore. 1, 6, 120 P.2d 753, 755 (1942) (“It is sufficient to constitute an insurable interest in property that the insured is so situated with reference to the property that he would be liable to loss should it be injured or destroyed by the peril against which it is insured.”). As an insurer of the Port, MACo/JPIA was financially liable for losses resulting from the destruction of property owned by the Port. Therefore, MACo/JPIA had an insurable interest in real property owned by the Port. Section 33-15-205(2), MCA. The policy’s clear designation of MACo and MACo/JPIA as the insured parties is fully consistent with the policy’s definition of insurable real property. The terms require no additional interpretation.
¶79 The Court also concludes that the duties to be undertaken by the insured in the event of a loss are inconsistent with a reading of MACo and MACo/JPIA as the insured. Opinion, ¶ 19. The policy requires the insured to protect the property from further loss or damage and to provide an inventory of lost or damaged property. The Court concludes, with no analysis, that MACo and MACo/JPIA lack the ability to undertake these duties. Opinion, ¶ 19. The Joint Powers Agreement establishing MACo/JPIA, however, authorizes MACo/JPIA to “establish reasonable and necessary loss reduction and prevention procedures to be followed by the members” and to “provide risk management and claim adjustment.” Members are obligated to allow MACo/JPIA “reasonable access to all premises of the member and all member records.” Members must also “cooperate fully” with MACo/JPIA for the adjustment of claims, “follow [...] loss reduction and prevention procedures,” and provide MACo/JPIA with “information on the value of buildings and contents.” Members may be expelled from the MACo/JPIA pool for failure to comply with loss prevention procedures or failure to provide reasonable access to all facilities and records.
¶80 With these powers in place, there is no reason to think that MACo and MACo/JPIA would be incapable of providing to Allianz an inventory of damaged property or acting to prevent further loss or damage to that property. Indeed, preparing an inventory of damaged property would appear to be essential to the exercise of MACo/JPIA’s *80 enumerated power to “provide risk management and claim adjustment.” MACo/JPIA is explicitly authorized to gain access to the premises of its members and to impose loss prevention procedures, which its members are required to follow. The provisions of the policy defining the responsibilities of the insured are not inconsistent with the designation of MACo and MACo/JPIA as insured parties.
¶81 Moreover, the Court, having determined that consideration of extrinsic evidence is necessary to interpret the policy, mischaracterizes the nature of that evidence. The Court concludes that MACo and the Port are “associated or allied” because each had a relationship with Lincoln County and because the Port paid insurance premiums to MACo/JPIA. This conclusion is not only inconsistent with case law defining the terms “associated or allied.” It also defies common sense.
¶82 The Court states that MACo exists to represent Montana counties before the state legislature, administrative agencies, and the federal government. Opinion, ¶ 21. The Court goes on to state that the Port exists for the purpose of promoting economic development in Lincoln County. Opinion, ¶ 22. The Court then concludes that these two organizations can be considered “associated or allied” because they serve the common purpose of “promoting] county governmental functions.” Opinion, ¶ 28. This is an unrealistically broad depiction of the purposes of MACo and the Port. MACo represents the general interests of Montana counties, not only Lincoln County. The Port, on the other hand, serves the limited purpose of promoting commerce and economic development exclusively within Lincoln County. While one does not wish to doubt the existence of collegiality among the governments of Montana counties, it is nevertheless apparent that the economic interests of a single county will not always be identical to the general interests of counties throughout the state. The facts do not support the conclusion that MACo and the Port have a common purpose.
¶83 Nor does the law support the conclusion that MACo and the Port are “associated or allied.” The Court relies on Old Colony Insurance for the proposition that a common purpose is sufficient to establish an association or alliance, but ignores the facts of that case, which established that two entities were associated when they had entered mutual agreements and traded shares of stock in such a way that one entity was effectively placed within the control of the other. Opinion, ¶¶ 25-26; Old Colony Ins. Co. v. Jeffery’s Mill & Warehouse, Inc., 146 F. Supp. 277, 279-80 (N.D. Cal. 1956). Old Colony Insurance also *81 defined “associated” entities not simply as those possessing a common purpose, but as those “[cjlosely connected or joined in a united action for a common purpose, interest, activity, objective, or the like.” Old Colony Ins. Co., 146 F. Supp. at 279. Undisputedly, MACo did not control the Port, and the Port did not control MACo. MACo and the Port each have a relationship with Lincoln County, but they serve distinct purposes. They are not closely connected or joined, and they are not participants in a united action.
¶84 In Travelers Indemnity Co. v. United States, the terms “affiliated” and “associated” were interpreted to “envision an intimate business relationship in which significant aspects of financial and managerial control of the insured and the affiliate or associate are integrated. More is required than common ownership and a limited sharing of facilities which aids each owner to pursue his independent and separate objectives.” Travelers Indem. Co. v. United States, 543 F.2d 71, 76 (9th Cir. 1976). The Ninth Circuit then concluded that “mutuality of interest” was not sufficient to establish an association between “independent entities each pursuing separate and distinct objectives.” Travelers Indem. Co., 543 F.2d at 76. Here, MACo and the Port have no common ownership. MACo and the Port have no integration of financial and managerial control. Although MACo and the Port share some mutuality of interest, they are independent entities each pursuing separate objectives. The law does not support the conclusion that the Port was a “subsidiary, associated or allied company, corporation, firm, [or] organization” of MACo.
¶85 The Court also addresses the only direct relationship between MACo and the Port: the contractual relationship between MACo/JPIA and the Port. The Court suggests that by submitting an insurance application and premium payments to MACo/JPIA, the Port became “associated or allied” with MACo. Opinion, ¶ 23. It is clear, however, that “an arm’s length contractual relationship would not constitute an association or affiliation.” Travelers Indem. Co., 543 F.2d at 76 n. 5 (citing In re Marine Sulphur Transp. Corp., 312 F. Supp. 1081, 1103 (S.D.N.Y. 1970), aff'd in part and rev’d in part on other grounds, 460 F.2d 89 (2d Cir. 1972)). The commonplace act of paying an insurance bill simply cannot be enough to establish a relationship as a “subsidiary, associated or allied company, corporation, firm, [or] organization.” The Court’s holding would transform ordinary consumers into corporate subsidiaries.
¶86 Having concluded that the Port is the insured party under the *82 Allianz policy, the Court then characterizes the policy as excess insurance, to be paid directly to the Port only after it has exhausted its primary coverage. Opinion, ¶¶ 29-32. This raises the question of what primary insurance coverage, if any, the Port had. The Court notes that MACo/JPIA has conceded that it insured the Port’s property. Opinion, ¶ 24. If the Allianz policy is to be applied as excess coverage, as the Court asserts, then Allianz’s liability would arise only after MACo/JPIA’s liability had been exhausted.
¶87 The declarations page of the policy issued by MACo/JPIA to the Port reads: “[Ajuthority agrees to provide coverage as follows:... Real & Personal Property Blanket Replacement $100,000,000/occurrence.” The second page of the policy sets out the “Limits of Liability” for the policy, and states: “Property Blanket Replacement at $100,000,000/occurrence to building/contents.” The following page defines the deductible for the MACo/JPIA policy, stating that MACo/JPIA’s liability “shall not be charged within the first $1,000 for any loss arising under Section[ ] I,” which includes the real and personal property coverage. The MACo/JPIA policy clearly indicates that MACo/JPIA is the Port’s primary insurer with a liability limit of $100,000,000.
¶88 The Allianz policy provides up to $100,000,000 in coverage with a $100,000 deductible. The policy states that if the insured has primary insurance with coverage greater than $100,000, the Allianz policy will apply “only after the limits of liability of such other insurance has been exhausted.” The Court does not address when Allianz’s liability as an excess insurer would arise, but appears to assume that Allianz is liable for amounts in excess of the $100,000 deductible. Opinion, ¶ 29.
¶89 It is clear from the terms of the Allianz policy, however, that if the Port is insured by both MACo/JPIA and Allianz, Allianz’s liability would arise only after the Port had exhausted its MACo/JPIA policy. As stated on the face of the MACo/JPIA policy and noted in the affidavit of MACo/JPIA’s trust administrator, that liability limit is $100,000,000, not $100,000. In order to support its construction of the Allianz policy as excess insurance to be paid directly to the Port, the Court must either rewrite the MACo/JPIA policy to establish a liability limit of $100,000-which appears nowhere in the text of the MACo/JPIA policy-or hold MACo/JPIA solely responsible for property insurance coverage up to $100,000,000.
¶90 The liability limits established by the Allianz and MACo/JPIA *83 policies are easily reconciled if the Allianz policy is treated as reinsurance. MACo/JPIA insures the Port for $100,000,000, charging the Port its own deductible. Allianz, in turn, insures MACo and MACo/JPIA for $100,000,000. For any loss over $100,000, the amount of the Allianz deductible, MACo/JPIA submits a claim to Allianz to cover its own liability. This conclusion is not only consistent with the plain terms of both the Allianz and MACo/JPIA policies; it is also consistent with how MACo/JPIA describes its own operations.
¶91 Our statutes provide that “[a] contract may be explained by reference to the circumstances under which it was made and the matter to which it relates.” Section 28-3-402, MCA. Therefore, a consideration of the MACo/JPIA insurance program is appropriate. MACo/JPIA administers a joint risk management pool for the benefit of its members, including the Port. The relationship between MACo/JPIA and the members it insures is governed by a Joint Powers Agreement which authorizes MACo/JPIA to purchase insurance coverage “to cover losses borne by the joint risk management pool,” not losses borne by individual entities. It is pursuant to this authority that MACo/JPIA obtained the Allianz policy. MACo/JPIA is responsible for insuring its members up to the $100,000,000 policy limit. Claims under $100,000 are paid from the joint risk management pool. For claims that exceed $100,000, MACo/JPIA submits its own claim under the Allianz policy.
¶92 By structuring its insurance program in this way, MACo/JPIA achieves several cost-saving measures beneficial to Montana counties and other public entities. MACo/JPIA negotiates for the purchase of insurance based on the combined value of all properties in the pool, giving the pool greater leverage and bargaining power than any single purchaser. The loss history of program participants is also pooled, so that counties with numerous losses, who would otherwise pay more for-insurance, are balanced out by counties with fewer losses. The loss history is further stabilized because MACo/JPIA pays all claims under $100,000 from the pool, thus reducing the number of claims that are presented to the insurer. MACo/JPIA assumes the burden of adjusting claims, ensuring that the insurer is presented only with those claims that are meritorious.- In the event of a catastrophic loss affecting multiple program participants, MACo/JPIA also allocates insurance funds fairly to each of the affected counties, rather than allowing each to make its own claim to the insurer and potentially exhaust the coverage.
*84 ¶93 The Port asserts that self-insurance pools, like MACo/JPIA, are not allowed to purchase reinsurance. This argument mischaracterizes both the plain language and the intent of § 2-9-211(1), MCA, which provides that “[p]olitical subdivisions that elect to procure insurance jointly (pooled fund) under this section may obtain excess coverage from a surplus lines insurer ... .” There is no reason to conclude that authorization of excess coverage implicitly prohibits reinsurance coverage. The language authorizing “excess coverage from a surplus lines insurer” was added in 1995 not to specifically authorize the purchase of excess or reinsurance coverage, which was already common practice, but to permit the purchase of such coverage from insurance carriers not licensed in the state. H. Local Govt. Comm., Hearing on H. Bill 54, Jan. 5, 1995; Sen. Bus. & Ind. Comm., Hearing on H. Bill 54, Jan. 26,1995. There is no indication in the record of any intent to prohibit reinsurance. H. Local Govt. Comm., Hearing on H. Bill 54, Jan. 5,1995; Sen. Bus. & Indus. Comm., Hearing on H. Bill 54, Jan. 26, 1995. Discussion of earlier amendments to § 2-9-211, MCA, indicates that reinsurance was considered essential to the viability of self-insurance pools. Sen. Local Govt. Comm., Hearing on Sen. Bill 2, March 25, 1986; H. State Admin. Comm., Hearing on Sen. Bill 2, March 27,1986. The Port’s argument that reinsurance is prohibited is without merit.
¶94 When interpreting a contract as a whole, we must “give effect to every part if reasonably practicable,” § 28-3-202, MCA, but only insofar as “it can be done without violating the intention of the parties,” § 28-3-201, MCA. Particular clauses must be treated as subordinate to the contract’s general intent. Section 28-3-307, MCA. The Court allows an ambiguity in the definition of personal property, not at issue in determining the coverage of the Port’s real property, to subvert the general intent of the contract and, as a result, restructure MACo/JPIA’s insurance program. The plain language of the Allianz policy, the definition of “associated or allied,” the facts of the relationship between MACo and the Port, the terms of the MACo/JPIA policy, and the circumstances under which the Allianz policy was issued all support the conclusion that the Port was not, and was never intended to be, an insured party as defined by the Allianz policy. I respectfully dissent from the decision of this Court holding that the Port qualifies as an insured under the terms of the Allianz policy.